STATE EX REL. PAYNE, Attorney General, Plaintiff, v. ANDERSON, Judge Of The Circuit Court, et al, Defendants.

(181 N. W. 839.)

(File No. 4818.    Opinion filed March 10, 1921.)

1. Criminal Law—Suspending Criminal Sentence After Its Imposition—Statute, Constitution, Construed, Re Executive Pardoning Power—Judicial Power Wanting.

Under Const., Art. 2, providing that the powers of government of the state are divided into three departments, legislative, executive and judicial, and that the powers and duties of each are prescribed by the Constitution, and Art. 4, Sec. 5, conferring upon the governor the power to remit fines and forfeitures, grant reprieves, commutations and pardons after conviction, and Sec. 4968, Code 1919, providing that all courts

have jurisdiction to try offenses under the laws of this state, and the judges thereof shall have power to suspend sentences of persons convicted of crime * * *, during good behavior, subject to such conditions as court or judge may impose, **held**, that if said statute was intended to confer pardoning power upon court or judges thereof, such statute is, to that extent, unconstitutional; since said Sec. 5 vests pardoning power in the Chief executive, and it· is and always has been deemed an executive function.

2. **Same—"Suspend," Meaning of, Whether Synonymous With "Postpone," Suspending Execution of Sentence, As Dis· tinguished.**

If in said statute the word "suspend" is used as synonymous to "postpone," it does not in effect confer upon circuit court or judge the power to suspend, so long as defendant should comply with certain conditions specified in the order, sentence already imposed and which is being served; since it is only by giving the word "suspend" as there used the limited meaning of postponing or interrupting execution of an imposed sentence, that the Court could find authority for such order.

3. **Same—Suspending Execution of Sentence, Effect, Comparison of With Pardon.**

While suspending execution of sentence does not effectuate all that results from pardon, since it does not finally and completely exonerate the convict nor restore him to all rights of citizenship, yet the power to indefinitely suspend execution of sentence confers upon court or judge power to grant the main thing accomplished by pardon—remission from punishment; since when a court is empowered to suspend such execution during good behavior the hope, if not the expectation, of court or judge is that the order of suspension will never have to be revoked.

4. **Same—Suspending Execution of Sentence, Power of Pending New Trial, Appeal, Application For Pardon, Distinguished From Power to Remit Penalty—Non-pardoning Power.**

While certain power exists in courts and judges to suspend execution of sentence pending hearing of motion for new trial or the effecting of an appeal, or pending application for pardon, such power does not confer power to remit the penalty; exercise of such power of suspending sentence not being deemed exercise of pardoning power.

5. **Same—Criminal Sentence, Indefinite Postponement of Execution Of, Tantamount to Pardoning Power, Non-possession of by Judiciary—Constitution.**

The overwhelming weight of authority is, that power to indefinitely postpone execution of a criminal sentence is of

the nature of and is in effect the pardoning power, therefore it cannot be conferred upon the judicial branch of government, under our Constitution (Art. 4, Sec. 5) conferring such power upon the governor.

6. **Same—Whether Statute Conferring Right to Suspend Imposition of Sentence is Constitutional, Not Decided.**

This Court is not called upon in this proceeding, to determine whether said Sec. 4968, Code 1919, is or not constitutional if construed as giving trial courts and judges the right to suspend imposition of sentence after conviction.

Original proceeding in certiorari by the State of South Dakota, on the relation of Byron S. Payne, Attorney General, against Frank Anderson, as Judge, and D. F. Stevens, as Clerk, of the Circuit Court, in and for the County of Roberts, State of South Dakota. Writ granted, and Circuit Court directed to nullify its order in the case of State of South Dakota v. Rolland Haugen, suspending criminal sentence imposed upon him.

*Byron S. Payne, and E. D. Roberts,* for Plaintiffs.

No appearance for Defendants.

(3) To point three of the opinion, Plaintiff cited: Alvarez v. State of Florida, 7 Am. & Eng. Ann. cases, 88, and cases cited therein; Snodgrass v. State, 150 S. W. 162; 41 L. R. A. (N. D.) 1144.

(5) To point five, plaintiff cited: Ex parte Hart (N. D.) 149 N. W. 568; In re Webb (Wis.) 62 N. W. 177; Re: Conditional discharge of Convicts (Vt.) 56 L. R. A. 569; State v. Voss (Ia.) 8, L. R. A. 767.

WHITING, J. This is an original proceeding in certiorari brought on the relation of the Attorney General to review the action of a judge of the circuit court. From the record certified to this court, it appears that one Haugen was convicted of a felony, and that upon such conviction he was, by defendant judge, sentenced to a term in the penitentiary of this state; that several months after such sentence, and while Haugen was serving same, the defendant did execute and cause to be filed and recorded, as a record of his court, one certain instrument purporting to be an order suspending the said sentence for an indefinite period, namely, so long as said Haugen should comply with certain conditions specified in said writing. It is to review the validity of such order of suspension that this proceeding was brought.

[1] Has the circuit court the right to suspend a criminal

sentence after the same has been imposed? Section 4968 provides that:

"All courts having jurisdiction to try offenses under the laws of this state, and the judges thereof, shall have power to suspend sentences of persons convicted of crime under the laws of this state, during good behavior, subject to such conditions as the court or judge thereof may impose."

[1] The Constitution of this state provides in article 2 thereof, that:

"The powers of the government of the state are divided into three distinct departments, the legislative, executive and judicial; and the powers and duties of each are prescribed by this Constitution."

Section 5, art. 4, of the Constitution confers upon the Governor, "the power to remit fines and forfeitures, to grant reprieves, commutations and pardons after conviction. * * *" It will thus be seen that the pardoning power is vested in the chief executive; it is now, as it always has been deemed to be, an executive function. It therefore needs no argument to support the proposition that, if the above section of our statutes was intended to confer the pardoning power upon the court or judges thereof, such statute is to that extent, unconstitutional.

[2] In what sense is the word "suspend" used in the above statute? If it is used as synonymous to "postpone," then it does not confer upon the defendant the power to do what he attempted to do in the order before us. It is only by giving the word "suspend," as used in said section, the limited meaning of the postponing or interrupting the execution of a sentence already imposed, that the defendant could find therein any authority for making such order. It will therefore be seen that, while such word is clearly susceptible of either construction, so that, under it, a court or judge would have the apparent right to suspend the imposition of a sentence and also the right to suspend the execution of a sentence, the real question now before us, under the facts of the present case, is whether such section, if construed as intending to give the power to suspend the execution of a sentence, is constitutional.

[3] While it is true that the suspending of the execution of a sentence does not bring as its results all that results from a pardon, as it does not finally and completely exonerate the party

convicted and does not restore him to all of his rights of citizenship, yet the power to indefinitely suspend the execution of a sentence places in the hands of the court or judge the power to grant the main thing accomplished by a pardon—remission from punishment. When a court is given the power to suspend the execution of a sentence during good behavior, the hope, if not the expectation, of the court or judge, is that the order of suspension will never have to be revoked.

[4] There is a certain power to suspend the execution of a sentence which has always been recognized as vested in courts and judges—the power to suspend pending a hearing of a motion for new trial, or pending the effecting of an appeal, or pending an application for pardon; but this power does not give to the court or judge any power to remit the penalty; and the exercise of such power has never been deemed, in the slightest degree, an exercise of the pardoning power.

[5] The practically unanimous, and certainly the overwhelming, weight of authority is that the power to indefinitely postpone the execution of a criminal sentence partakes of the nature, and is in effect the pardoning power, and therefore cannot be conferred upon a judicial branch of government under a Constitution such as ours. This subject will be found exhaustively treated in State v. Osborne, 79 N. J. Eq. 430, 82 Atl. 424; Tanner v. Wiggins, 54 Fla. 203, 45 South. 459, 14 Ann. Cas. 718; Ex parte Clendenning, 22 Okl. 108, 97 Pac. 650, 19 L. R. A. (N. S.) 1041, 132 Am. St. Rep. 628; Neal v. State, 104 Ga. 509, 30 S. E. 858, 42 L. R. A. 190, 69 Am. St. Rep. 175.

[6] We are not called upon at this time to determine whether or not our statute is constitutional, if construed as giving to the trial courts and judges thereof the right to suspend the imposing of a sentence after conviction; and we therefore do not feel justified in expressing any views thereon. We would call attention to the following cases that treat of this question: People v. Brown, 54 Mich. 15, 19 N. W. 571; People v. Court Sessions 141 N. Y. 288, 36 N. E. 386, 23 L. R. A. 856; Marks v. Wentworth, 199 Mass. 44, 85 N. E. 81; State v. Smith, 173 Ind. 388, 90 N. E. 607.

The circuit court is directed to cancel and treat for naught its order of date April 16, 1920, in the case of State of South Dakota v. Rolland Haugen.

APPENDIX.

IN RE OPINION OF THE JUDGES.

(177 N. W. 812.)

(Opinion filed May 20, 1920.)

1. **Constitution—Article XIII—Authorized Manufacture, Distribution, Sale of Electric Current, Whether Work of Internal Improvement.**

   Const., Art. XIII, Sec. 12, declaring the manufacture, distribution and sale of electric current for heating, lighting and power purposes to be works of public necessity and importance in which the state may engage, and authorizing suitable laws to be enacted empowering state to acquire, by purchase or appropriation, all lands, easements, rights of way, track, structure, equipment, motive power, facilities, etc., incident or necessary to the acquisition, ownership, control, development and operation of the water powers of this state, and to carry said provisions into effect, etc., defines an enterprise which is a work of internal improvement.

2. **Same—Article XIII, Secs 1, 2, 13, 16—Debt Limit in Sec. 2, Whether Applicable to Sec. 12—Aggregate Indebtedness Under All Sections Explained—Sections Distinguished Re Indebtedness.**

   It is clear by reason of Const., Art XIII, Sec. 1, authorizing state to engage in works of internal improvement, own and conduct proper business enterprises, loan or give its credit to or in aid of any association, etc., and to establish and maintain a system of rural credits and thereby loan money and extend credit to the people of the state upon realty security, and providing that the limit of indebtedness contained in Sec. 2 of said article shall not apply to provisions of Sec. 1, but that the state indebtedness for purposes contained in Sec. 1 other than for rural credits shall never exceed one-half of one per cent of assessed valuation of state property; and Sec. 16, providing that the state may engage in works of internal improvement, any provision in the constitution, or limitation in Sec. 2 of Art. XIII, to the contrary notwithstanding, and that the state indebtedness for purposes contained in said Section shall never exceed one-half of one per cent of assessed valuation of all state property—that the debt limit found in Art. XIII, Sec. 2, providing that for purposes of defraying extraordinary expenses and making public improvements, or to meet casual deficit or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate $100,000, (except for purpose of repelling invasion, etc.,) does not apply to Art. XIII, Sec. 12, supra; but by reason of the debt limit of

one-half of one per cent of said assessed valuation found in Secs. 1 and 16, **held,** the aggregate indebtedness for all purposes covered by said sections, (including the purpose defined in Art. XIII, Sec. 12) cannot exceed such limit, unless the provisions of Art. XIII, Secs. 12 and 13, are excepted from such debt limit (Sec. 13 providing that state may pledge such plants and their accessories and may pledge the state's credit, to provide funds for purpose enumerated in Sec. 12, any provision in the Constitution to contrary notwithstanding.)

3.  **Same—Sec. 13, Intent of As Taking Sec. 12 Out from Operation of Another Section Re One-half of One Per Cent Debt Limit—Sec. 13 As Distinguishing Specified Improvements from General Internal Improvements.**

    By the provisions of said Sec. 13, Art. XIII, the people intended to take the provisions of Sec. 12, Art. XIII, out from the operation of any other section of the Constitution, including the debt limit of one-half of one per cent; the adoption of Sec. 13 was a setting apart of the form of internal improvement. therein provided for from the provisions regulating internal improvements generally; to hold otherwise would render the language of Sec. 13 practically meaningless.  Schaaf v. S. D. Rural Credits Board, 39 S. D. 377, referred to.

4.  **Same—Constitution, Article XI—Revenue and Finance—State Two Mill Tax, Whether Applicable to Operation of Article XIII, Secs. 12, 13.**

    The provisions of Const., Art. XIII, Sec. 1, providing that the Legislature shall provide for an annual tax to defray ordinary state expense, not to exceed in any one year two mills on each dollar of assessed valuation of state taxable property, do not apply to the operation of the provisions of Art. XIII, Sec. 12, authorizing state to pledge the plant referred to in Sec. 12 and all accessories, and the credit of the state, to provide funds for purposes enumerated in that section, any provision in the Constitution to the contrary notwithstanding; and following the reasoning in Schaaf v. Rural Credits Board, 39 S. D. 377, the effect of the new Secs. 12 and 13, of Art. XIII is to except such sections from the operation of Art. XI, Sec. 1, relating to the two mill state tax for ordinary state expenses.

5.  **Same—Rural Credits Acts, Indebtedness Incurred Re, Not a Debt Within Constitutional $100,000 Debt Limits, Nor Within Two Mills Tax Limit**

    Reference is made to Advisory Opinion of the Judges Upon the Rural Credits Acts (38 S. D. 650), to the effect that the indebtedness to be incurred for rural credits purposes was not a debt within the meaning of the $100,000 debt limit provided in Const., Art. XIII, Sec. 2; and by the same token it was not a debt within the meaning of Art. XI, Sec. 1, providing for the

state two mills tax assessment; therefore, under either the theory of this Opinion or that of our Rural Credit Acts the result, as regards the effect of the constitutional provisions herein construed, is the same; and the clear purpose of Art. XIII, Sec. 13, was to give the Legislature a free hand in carrying out the provisions of Art. XIII, Sec. 12, unhampered by any other provision of the Constitution.

6.   Same—State Manufacture, Distribution, Sale of Electric Current for Power, Etc., As Public Necessity, Pledging State Plants and Credit Therefor—Limitation in Pledging Current Defined.
    The only limitation in the pleading of the state's credit for the purpose of engaging in enterprise specially authorized by Constitution, Art. XIII, Secs. 12 and 13, is the requirement (in Sec. 12) that two-thirds of the members elect of each branch of the Legisalture shall assent thereto.

7.   Same—Const., Art. XI., Sec. 1, Regarding Annual Tax Levy to Pay Public Debt in Ten Years, Whether Applicable to Art. XIII, Secs. 12, 13, Regarding Ten Year Bond Period.
    That portion of Const., Art. XI, Sec. 1, providing that for purpose of paying public debt, the Legislature shall provide for levying a tax annually sufficient to pay annual interest and the principal of such debt within ten years from passage of law creating the debt, does not apply to an indebtedness created under provisions of Art. XIII, Secs. 12 and 13, declaring the manufacture, etc., of electric current for power, etc., purposes to be works of public necessity and importance in which the state may engage, and authorizing Legislature to empower the state to acquire lands, etc., incidental or necessary to the acquisition, etc., of water powers of the state, etc., with the proviso that no expenditure of money for purposes therein enumerated shall be made by vote of two-thirds of the members elect of each branch of the Legislature, and Sec. 13, authorizing state to pledge such plants, their accessories and the state's credit, to provide funds for purposes enumerated in Sec. 12, any provision in the Constitution notwithstanding; hence bonds of the state which may be issued in carrying out the purposes of said Sec. 12, 13, are not limited to the period of ten years referred to in Sec. 1, Art. XI.

8.   Same—Constitutional Two Mills State Tax Re Art. XI, Sec. 1, Whether Applicable to Indebtedness for State Manufacture, Etc., of Electric Current, Re Article XIII, Sec. 12, 13.
    The limitation in Const., Art. XI, Sec. 1, providing that an annual tax for payment of interest and principal of the public debt shall not exceed in any one year two mills on each dollar of the assessed valuation of all taxable state property, does not apply to an indebtedness created for the purpose of carrying out the enterprise authorized by Art. XIII, Secs. 12 and 13.

Advisory opinion of the Judges of the Supreme Court relative to Constitutional provision concerning State Internal Improvements through Hydro-electric Commission; in response to request by the Governor of South Dakota.

Opinion of the Judges in response to the request of the Governor relative to Const. art. 13, §§ 12, 13. Questions answered.

To His Excellency, Peter Norbeck, Governor of the State of Dakota—Sir:

On May 13, 1920, you presented to the Judges of the Supreme Court the following communication:

To the Honorable Judges of the Supreme Court of the State of South Dakota:

I desire to call upon you for an opinion on an important question of law which is involved in the exercise of my powers as chief executive of the state of South Dakota. The Legislature has been called to meet in special session on May 24th next, and it is my duty, under the Constitution of the state, to communicate to the Legislature by message information of the condition of the state and to recommend measures that I deem expedient.

The Legislature which met in regular session in the year 1919, by chapter 225 of the laws of that session, created the hydro-electric commission and authorized such commisson to employ engineers to make an engineering survey of the power sites upon the Missouri river in this state, and to recommend the selection therefrom of the one most available for immediate development, and to make a survey of the probable cost of such development and the cost of the distribution of electric current throughout the state. Such commission proceeded with its work and the report of the engineers employed by the commission has been filed in the office of the Governor. Such report selects a site for the development of power and makes an estimate of the cost of development and transmission of such power.

It appears from such report that it is feasible to develop power upon said river within the state of South Dakota, and that the cost thereof is not prohibitive if the people of this state shall determine that it is expedient to engage in such enterprise. In order to develop a power plant it will be necessary that an

indebtedness be created by the state for substantially the cost of the plant, which is estimated by the engineers, at present prices, to be $16,147,000.

It is my view that the creation of an indebtedness of this size for this special purpose should be made only by a vote of the people therefor.

In order that there may not be delay and wasted effort and expense in the submission of the proposition to the people, it is important that the executive and the Legislature know whether the Constitution of the state permits the state to proceed with this enterprise, or whether the Constitution of the state must first be changed before attempting to proceed with same.

At the general election in 1918, the people amended the Constitution by adopting sections 12 and 13 of article 13 of the Constitution. This amendment is as follows:

"Sec. 12.     The manufacture, distribution and sale of electric current for heating, lighting and power purposes are hereby declared to be works of public necessity and importance in which the state may engage, and suitable laws may be enacted by the Legislature to empower the state to acquire, by purchase or appropriation, all lands, easements, rights of way, tracks, structures, equipment, cars. motive power implements, facilities, instrumentalities, and material incident or necessary to the acquisition, ownership, control, development and operation of the water powers of this state, and to carry this provision into effect: Provided, however, that no expenditure of money for the purposes enumerated in this section shall be made except by a vote of two-thirds of the members elect of each branch of the Legislature.

"Sec. 13.     The state may pledge such plants and all of the accessories thereto, and may pledge the credit of the state, to provide funds for the purposes enumerated in section 12 of this article, any provision in this Constitution to the contrary notwithstanding."

At the same election, the people amended section 1 of said article 13 of the Constitution so as to provide that—

"For the purpose of developing the resources and improv-

ing the economic facilities of South Dakota, the state may engage in works of internal improvement, may own and conduct proper business enterprises, may loan or give its credit to, or in aid of, any association, or corporation, and may become the owner of the capital stock of corporations, organized for such purposes. * * * The limit of indebtedness contained in section 2 of this article shall not apply to the provisions of this section, but the indebtedness of the state for the purposes contained in this section, other than for rural credits, shall never exceed one-half of one per cent. of the assessed valuation of the property of the state."

Also, the provision limiting the indebtedness of the state to $100,000 contained in section 2 of said article 13 of the Constitution has not been expressly removed from the Constitution. Furthermore, section 1 of article 11 of the Constitution provides as follows:

"And for the purpose of paying the public debt, the Legislature shall provide for levying a tax annually, sufficient to pay the annual interest and the principal of such debt within ten years from the final passage of the law creating the debt; provided, that the annual tax for the payment of the interest and principal of the public debt shall not exceed in any one year two mills on each dollar of the assessed valuation of all taxable property in the state, as ascertained by the last assessment made for the state and county purposes."

Practical business experience clearly demonstrates that an enterprise of the magnitude of the development of a power plant upon the Missouri river cannot be undertaken upon a credit of one-half of one per cent. of the assessed valuation of the property of the state. The state, through its Legislature, has already authorized the issue of bonds for highway and other purposes which largely consume the amount allowed under this limit. Likewise, it will be impracticable for the state to issue bonds maturing in so short a period as 10 years, and to require that money be raised by taxation in that period to discharge same. It will require at least 5 years to construct such a plant and to get it in operation. As a successful business proposition it should be financed and maintained by the revenues from the

plant. Manifestly, 10 years is too short a time within which to construct, put in operation and finance an enterprise of this magnitude.

Likewise, in order to secure funds for the enterprise by the sale of bonds, it must be clear that the state is authorized to pledge its credit to the full extent of discharging the obligations of such bonds. The plants and the revenues therefrom may be pledged in the first instance, but beyond this the purchaser of the state's obligations will require the credit of the state to be pledged. Any other plan will make the obligations unsalable. Any limitations in the Constitution which restrict the right of the state to pledge its credit, or restrict the state in discharging its obligations by limiting the rate of tax levy or otherwise, will make it correspondingly difficult for the state to conduct the enterprise.

It is my understanding that sections 12 and 13 of article 13 of the Constitution was drafted, submitted to the Legislature and adopted by the people as a special amendment to the Constitution of the state. whereby the state might engage in an enterprise of this kind and pledge its credit without being limited by the other provisions of the Constitution, relating to other works of internal improvement. If such was not its purpose, it had no special purpose, since the state by section 1 of said article 13 had the power generally to engage in such enterprise.

In order that I may be advised in making recommendations to the Legislature at the coming special session with relation to proceeding with this enterprise, I desire to ask the opinion of your honors upon the construction to be placed upon the Constitution of the state with reference to the following:

1. How, if at all, is the state limited in the pledge of its credit for the purpose of engaging in enterprises specially authorized by sections 12 and 13 of article 13 of the Constitution?

2. Will that portion of section 1 of article 11 of the state Constitution, which provides as follows: "And for the purpose of paying the public debt, the Legislature shall provide for levying a tax annually, sufficient to pay the annual interest and the principal of such debt within ten years from the final passage

41—Vol. 43, S. D.

of the law creating the debt"—apply to an indebtedness created under the provisions of sections 12 and 13 of article 13 of the Constitution of the state, so that the bonds of the state cannot be issued for a longer period than 10 years, and so that a tax must be levied annually to pay off such indebtedness within said period?

3. Does the limitation in section 1 of article 11 of the Constitution, which provides that an annual tax for the payment of the interest and principal of the public debt shall not exceed in any one year two mills on each dollar of the assessed valuation of all taxable property in the state, apply to an indebtedness created for the purpose of carrying out the enterprise authorized by sections 12 and 13 of article 13 of the Constitution?

I submit herewith a memorandum brief of authorities relating to the foregoing inquiries, which was prepared by the Attorney General at my request.

Respectfully submitted,

[Signed]   PETER NORBECK,

Governor of South Dakota.

Pierre, South Dakota, May 13, 1920.

We recognize that the questions of law submitted are involved in the exercise of your executive powers, and therefore that under Constitution, art. 5, § 13, it is our duty to give you an advisory opinion thereon.

The questions asked concern the proper interpretation of sections of the Constitution which apparently are conflicting. In addition to the constitutional provisions quoted in the request, one of which was referred to, are the following:

"For the purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate one hundred thousand dollars, and no greater indebtedness shall be incurred except for the purpose of repelling invasion, suppressing insurrection, or defending the state or the United States in war. * * * Article 13, § 2.

"The state may engage in works of internal improvement,

any provision in this Constitution, or limitation in section 2 of this article, to the contrary notwithstanding. The indebtedness of the state for the purposes contained in this section shall never exceed one-half of one per cent. of the assessed valuation of all property in this state, and no such indebtedness shall be incurred nor money expended, except upon a two-thirds vote of the members elect in each branch of the Legislature." Article 13, § 16.

[1, 2] Beyond any doubt the enterprise authorized by article 13, § 12, is a work of internal improvement. Therefore, without considering the effect of article 13, § 13, it appears entirely clear that by reason of article 13, §§ 1, 16, the debt limit of $100,000 found in article 13, § 2, does not apply to article 13, § 12. But by reason of the debt limit of one-half of one per cent. of the assessed valuation of all property in this state found in said sections 1 and 16 of article 13, the aggregate indebtedness for all purposes covered by said sevtions (including the purposes of article 13,, § 12) cannot exceed such limit unless the provisions of article 13, §§ 12, 13, are excepted from such debt limit.

We requote the provisions of article 13, § 13:

"The state may pledge such plants and all of the accessories thereto, and may pledge the credit of the state to provide funds for the purposes enumerated in section 12 of this article, any provision in this Constitution to the contrary notwithstanding."

[3] It is our opinion that by the provisions of this section the people of the state intended to take the provisions of article 13, § 12, out from the operation of any other section of the Constitution, including the debt limit of one-half of one per cent. The adoption of said section 13 was a setting apart of this form of internal improvement from the provisions regulating internal improvements generally. To hold otherwise would render the language of said section 13. practically meaningless. This conclusion is fortified by the decision in Schaaf v. S. D. Rural Credits Board, 39 S. D. 377, 164 N. W. 964, where under a much less explicit constitutional provision the same result was reached.

[4] It is our opinion that the provisions of article 11, § 1, do not apply to the operation of the provisions of article 13, §

12. In Schaaf v. Rural Credits Board, supra, the majority of this court were of the opinion that the rural credits amendment of 1916 to article 13, § 1, was "a broad, sweeping, unconditional, unlimited and unqualified amendment," and "that all of the provisions of our state Constitution which would otherwise have prohibited the enactment of said rural credits system law have been modified, qualified, and made subservient to the express and necessarily implied provisions of the 1916 amendment." Following that reasoning, the effect of new sections 12 and 13 of article 13 is to except such sections from the operation of article 11, § 1.

[5] In the advisory opinion given you upon the Rural Credits Acts (38 S. D. 635, 162 N. W. 536), the then majority of the judges were of the opinion that the indebtedness to be incurred for rural credits purposes was not a debt within the meaning of the $100,000 debt limit. By the same token it was not a debt within the meaning of the provisions of article 11, § 1. Therefore, under either theory, the result is the same.

The clear purpose of article 13, § 13—else there was no purpose—was to give the Legislature a free hand in carrying out the provisions of article 13, § 12, unhampered by any other provision of the Constitution.

[6] We therefore answer the question propounded as follows:

Question 1. The only limitation is the requirement that two-thirds of the members elect of each branch of the Legislature assent thereto.

[7] Question 2. No.

[8] Question 3. No.

In giving the foregoing answers we are assuming it to be settled that the purposes of article 13, § 12, are public purposes.

Respectfully submitted,

J. H. McCOY,
CHAS. S. WHITING,
ELLISON G. SMITH,
SAMUEL C. POLLEY,
JOHN HOWARD GATES,
Judges of the Supreme Court of South Dakota.

## APPENDIX.

## IN RE OPINION OF THE JUDGES.

### (180 N. W. 64.)

(File No. 4810.   Opinion filed November 13, 1920.)

**Executive Officials—Courts—Supreme Court—Advisory Opinion to Governor—Constitutional Law—"Solemn Occasions"—Land Settlement Board, Proposed Bond Issue By, Constitutionality Of Statute Re—Former Bond Issue Outstanding—Ex Parte Opinion Involving Private Rights—Opinion Declined.**

Only the gravest and most urgent necessity will justify the Supreme Court in rendering an ex parte opinion where private rights are involved, in response to a question by the Governor under Const., Art. 5, Sec. 13; and where such executive's request is for an opinion of the Judges involving Laws 1919, Ch. 315, known as the South Dakota Land Settlement Act, which provides for issuance of bonds as obligations of the state, to be signed by the Governor and the Land Settlement Commissioner and attested by the Secretary of State, and the request represents that it is the intention of said Board to issue  and sell a series of bonds in a specified amount, and that said Board has already issued bonds under provisions of said act in an amount specified, which bonds have been sold and are now outstanding; and such Executive's request for an opinion of the Judges as to whether or not bonds issued under the provisions of said act would constitute valid and binding obligations on the State of South Dakota, is declined; the application not being a case of gravest and most urgent necessity within the rule heretofore laid down by the Court.

In the matter of a request for an opinion of the Judges of the Supreme Court involving Laws 1919, Chapter 315, made by the Governor of the State of South Dakota.   Request denied.

To His Excellency, Peter Norbeck, Governor of the State of South Dakota—Sir:

On November 5, 1920, you presented to the Judges of the Supreme Court the following communication:

"To the Honorable Judges of the Supreme Court of the State of South Dakota.

"May It Please Your Honors: The Legislature of this state has enacted chapter 315, Session Laws of 1919, known as the South Dakota Land Settlement Act, which provides for the issuance of bonds as obligations of the state of South Dakota, and it

is now the intention of the board to issue and sell a series of such bonds in the amount of $250,000.00. Section 9 of the act provides that such bonds shall be signed by the Governor and the land settlement commissioner, and shall be attested by the secretary of state. Because of the fact that this law imposes upon me, as Governor, the duty of signing such bonds, may it please your honors to prepare and submit to me your opinion as to the constitutionality of said law, and as to whether or not bonds issued under the provisions thereof would constitute valid and binding obligations on the state of South Dakota.

"In order that the court might be fully advised as to the facts relating to this matter. I desire to inform you that the land settlement board has been in operation for some time past, and has already issued bonds under the provisions of said Chapter 315, Session Laws of 1919, in the amount of $200,000, which bonds have been sold and are now outstanding.

"Respectfully submitted,

[Signed]  Peter Norbeck,
"Governor of South Dakota.

"Dated this 5th day of November, 1920.

By the provisions of article 5 § 13, of the Constitution you are authorized to require the opinions of the judges of the Supreme Court upon important questions of law involved in the exercise of your executive powers and upon solemn occasions.

It appears from your inquiry that bonds in the sum of $200,-000, issued under the provisions of the act in question, have already been sold and are outstanding. It thus appears that an answer to your question would amount to the expression of an opinion as to the validity of those bonds without the bondholders having had an opportunity to be heard upon the questions that might thereby be involved.

In an opinion entitled In re Construction of Constitution, 3 S. D. 548, 54 N. W. 650, 19 L. R. A. 575, the judges of this court said:

"It is a principle declared by our Constitution (section 2, art. 6), and of universal recognition, that no person shall be deprived of life, liberty, or property without due process of law. There can be no due process of law unless the party to be affected has his day in court. Yet a hasty construction and application of this

provision might lead to the ex parte adjudication of private rights by means of an executive question, without giving the party interested a day or voice in court."

In an opinion entitled In re Chapter 6, Session Laws 1890, 8 S. D. 274, 66 N. W. 310, the judges of this court said:

"It is evident that a construction of the statute to which our attention is called would substantially affect the righs of persons now acting as regents of education. To determine such rights in advance of any contention on their part, and without such persons having an apportunity to be heard, seems to us exceedingly undesirable, and not in accord with the methods usually employed in judicial procedings."

In an opinion entitled In re House Resolution No. 30, 10 S. D. 249, 72 N. W. 892, the judges of this court said:

"The legal effect of an answer to the question here propounded not only involves the validity of the resolution presented, and an appropriation of $6,000 to carry the same into operation, but requires us to determine, without a day in court, or the aid of counsel, the rights of commissioned officers to hold important appointive public positions, and receive compensation for services already rendered."

In an opinion entitled In re Opinion of the Judges, 34 S. D. 650, 147 N. W. 729, the judges of this court, in reviewing the foregoing opinions and the opinions of the judges of the courts of other states, said:

"It thus seems to be the settled rule of this jurisdiction that only the gravest and most urgent necessity will justify us in rendering an ex parte opinion where private rights are involved."

We are of the opinion that the facts presented do not bring your inquiry within the exception noted in the last quotation. Therefore, in view of the settled practice in this behalf, we must respectfully decline to answer your inquiry.

Respectfully submitted.

J. H. McCOY,
CHAS. S. WHITING,
ELLISON G. SMITH,
SAMUEL C. POLLEY,
JOHN HOWARD GATES,
Judges of the Supreme Court of South Dakota.

## APPENDIX.

## IN RE OPINION OF THE JUDGES.

### (180 N. W. 957.)

(File No. 4837.   Opinion filed December 29, 1920.)

**1.   States—State Manufacture, Sale, of Cement and Products, Bond
Issue Therefor—Title to Authorizing Act, Index to Contents,
Whether Bonds Thereunder Valid Under Constitution Re Title.**

The title to Chap. 324, Laws of 1919, while unnecessarily
specific as an index of the contents of the act, appears
to cover such contents, therefore a proposed bond issue under
said act would not be invalid under Const., Art. 3, Sec. 21, pro-
viding that no law shall embrace more than one subject, which
shall be expressed in its title.

**2.   Statutes—Enactment—Journals and Enrolled Bill Showing Act
Lawfully Adopted and Approved Re Constitution—Enrolled
Bill Conclusive on Courts.**

It appears from journals of the House and Senate, as well
as the enrolled bill on file in the office of the Secretary of
State, that Chap. 324, Laws of 1919, was lawfully adopted and
approved under requirements of Const., Arts. 3 and 4, relating
to the Legislative Department of the Government and the
enactment of laws; although the enrolled bill on file in such
office is conclusive upon the courts.

**3.   State Cement Commission—Manufacture, Sale, of Cement and
Products, Power of State Re—State Bonds, Issue of For Pur-
chase of Plant—Statute, Whether Constitutional—Debt Limi-
tation—Previous Opinion Followed.**

The power of the state under Const., Art. 13, Sec. 10, auth-
orizing the state to acquire lands, etc , structures, etc., neces-
sary or incident to carry out the provisions of said section, and
Section 11, authorizing state to pledge such cement plants and
accessories, and the state's credit, to provide funds for such
purposes, "any provision in this constitution to the contrary
notwithstanding,"—is, by said Sec. 11, taken out of operation
of Sec. 1, specifying a limit of indebtedness for state internal
improvements, of one-half of one per cent of assessed valuation
of state property, and also out of operation of Art. 11, Sec. 1,
limiting the duration of a state debt and rate of tax for paying
it; following In Re Opinion of the Judges, 43 S. D. 635, 177
N. W. 812, wherein Secs. 12, 13, Art. 13, were compared with
Sec. 1 and with Art. 11, Sec. 1.

**4.   Same—Power of State Re Cement Manufacture, Statute, Whether
Violative of Constitution Re Due Process; Just Compensation;
Taxation; Equality and Uniformity; Privileges and Immuni-
ties; Taxation For Public Purposes; Aggregate Indebtedness**

Laws 1919, Chap. 324, declaring that the manufacture, distribution and sale of cement and cement products are public purposes, etc., creating a State Cement Commission, authorizing state to borrow money on bonds secured by good faith and credit of the state for purposes of acquiring realty and to purchase or construct buildings, etc., for operation of such plants, and appropriating moneys therefor, etc., is authorized by Const., Art. 13, Secs. 10 and 11, declaring such manufacture, etc., to be works of public necessity, etc., and authorizing Legislature to empower the state to acquire by purchase, etc., such lands, etc., structures, etc.; and said act is valid as against objections that it is repugnant to Const., Art. 6, Sec. 2, providing that no person shall be deprived of life, liberty or property without due process of law, and to Sec. 13, providing that private property shall not be taken for public use or damaged, without just compensation, etc.; to Sec. 17, providing among other things that all taxation shall be equal and uniform; to Sec. 18, providing that no law shall be passed granting to any citizen, class of citizens * * privileges or immunities which upon the same terms shall not equally belong to all citizens * *; and to Art. 13, Sec. 2, limiting the aggregate state indebtedness for purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue to $100,000.

5.  State Cement Commission—Manufacture, Distribution, Sale, of Cement and Products—Statute Declaring Purposes Public—Constitutional Amendment Declaring Public Necessity and Importance, Amendment Re Purposes and Taxation For, Conclusive on Courts.

In view of Const., Art. 11, Sec. 2, providing that taxes shall be levied and collected for public purposes only, and of Sec. 10, Art. 13, declaring that the manufacture, distribution and sale of cement and cement products are thereby declared to be works of public necessity and importance in which the state may engage, and of Laws 1919, Chap. 324, whose title declares that such manufacture, etc., are public purposes impressed with a public use and, as such governmental functions, subject to regulation, and creating a State Cement Commission, defining. its powers and duties, authorizing the state to borrow money on bonds secured by good faith and credit of state for purposes of acquiring realty, and to purchase or construct buildings, etc., and for management, etc., of cement plants, and making an appropriation therefor; held, that while it might have been doubtful whether the purpose of said act was a public purpose had it rested upon Legislative definition alone, yet, the people by such constitutional amendment having so declared concerning the manufacture, etc., of cement and products, held, that

taxation authorized by said chapter is for a public purpose, and
it is not open to courts to say otherwise.

6.  Same—Acquiring Realty For, Constructing, Maintaining Cement
      Plants, Manufacturing Cement and Products, Borrowing Mon-
      ey, Issuing Bonds, Therefor, Levying State Tax to Pay—Act,
      Whether Violative of Federal Fourteenth Amendment Re Due
      Process, Equal Protection.

        Laws 1919, Chap. 324, providing for creation of the State
      Cement Commission, authorizing it to acquire by purchase or
      otherwise realty for state cement plants and to locate, construct
      and maintain a cement plant or plants, to borrow money and
      issue and dispose of bonds to be used for said purposes and for
      leasing of such plants, and authorizing State Tax Commission to
      annually levy a specified tax on assessed valuation of all tax-
      able property in the state to pay interest and principal of such
      bonded indebtedness as it falls due, and pledging the good faith
      and credit of the state for redemption of such bonds—is not
      violative of the Fourteenth Amendment to the Federal Consti-
      tution concerning due process of law and equal protection of
      the laws.

In the matter of the Opinion of the Judges of the Supreme
Court, in response to the request of Peter Norbeck, Governor of
the State, concerning the validity of Laws 1919, Chap. 324, relat-
ing to the manufacture, distribution, and sale of cement and
cement products by the State.   Statute held constitutional.

To His Excellency, Peter Norbeck—Governor of the State of
                    South Dakota—Sir:

On December 24, 1920, you presented to us the following
communication:

"To the Honorable Judges of the Supreme Court of the State of
                    South Dakota:

"May It Please Your Honors:

"The Legislature of this state has enacted chapter 324 of the
Session Laws of 1919 relating to the manufacture, distribution
and sale of cement and cement products by the state.  This com-
mission, of which I am ex-officio chairman, under the provisions
of section 2, has completed its exploration of materials and re-
sources within the state, which may be used in the manufacture
of cement and cement products and has made a thorough and com-
plete investigation of the different prospective sites for cement
plants, and has obtained data relating to transportation facilities,
coal and other fuel supply, and to the demand for and the cost of

production of such products; and as a result of such investigation such commission has determined that the state can successfully engage in the manufacture of cement and cement products and has made an order locating said plant in the vicinity of Rapid City, Pennington county, South Dakota, at which it is proposed that the state shall engage in the manufacture, sale and distribution of such cement and cement products. This order has been entered upon the journal showing the proceedings of said commission.

"The said act of the Legislature provides for the issuance of bonds as obligations of the state of South Dakota, and it is now the intention of the board to issue and sell a series of bonds in an amount aggregating two hundred fifty thousand ($250,-000.00) dollars. Section 2 of the act provides that the commission shall consist of the Governor, who shall be chairman, and four other members. Subdivision A of section 6 provides that the bonds issued by the commission shall be executed in the name and on behalf of the state by the chairman and secretary of the commission. Because of the fact that this law imposes upon me as Governor and ex-officio chairman of the commission the duty of signing such bonds, may it please your honors to prepare and submit to me your opinion as to the constitutionality of said law, and as to whether or not bonds issued under the provisions thereof would constitute valid and binding obligations of the state of South Dakota. In order that the court may be fully advised as to the facts relating to this matter, I desire to inform you that no bonds or warrants have as yet been issued by said commission.

Respectfully submitted,

[Signed] Peter Norbeck,
Governor of South Dakota.

"Dated this 23d day of December, 1920, A. D."

The inquiry is a broad one, covering, as it does, all possible points of attack upon the proposed bond issue based upon any infringement of the Constitution.

[1] The title to chapter 324, Laws 1919, while unnecessarily an index of the contents of the act, appears to cover such contents and we do not think the bond issue would be invalid under the provisions of Const. art. 3, § 21.

[2]  We have examined the journals of the House and Senate, as well as the enrolled bill on file in the office of the secretary of state, and find that the act was lawfully adopted and approved under the requirements of Const. arts. 3, 4, although under the decisions in Krakowski v. Waskey, 33 S. D. 335, 145 N. W. 566, and State ex rel. Graber v. Schmidt, 173 N. W. 838, the enrolled bill on file in the office of the secretary of state is conclusive upon the courts.

[3]  In so far as the questions may arise that were asked by you concerning the Hydro-Electric Act (chapter 225, Laws 1919), we answer the same as we then did (In re Opinion of the Judges, (43 S. D. 635, 177 N. W. 812,) for the reason that the constitutional provisions underlying each act are the same in principle. Compare Const. art. 13, §§ 10, 11, with sections 12 and 13.

[4]  In the case of Schaaf v. S. D. Rural Credit Board, 39 S. D. 377, 164 N. W. 964, it was alleged that the Rural Credits Act violated sections 2, 13, 17 and 18 of article 6, and section 2 of article 13 of our Constitution.  We have examined these sections in connection with chapter 324, Laws 1919, and for the reasons specified in Schaaf v. S. D. Rural Credit Board, supra, we are of the opinion that the bonds in question will not be invalid under any of said sections of the Constitution.

[5]  There remains one constitutional inquiry that was assumed in our reply to your inquiry in reference to the Hydro-Electric Act, and which was casually referred to in Schaaf v. S. D. Rural Credit Board, supra, and that is whether the purpose of chapter 324, Laws 1919, is a public purpose.  In view of the provision of Const. art. 11, § 2, that taxes shall be levied and collected for public purposes only, it might have been doubtful whether the purpose of said chapter 324 was a public purpose if that act had rested upon legislative definition alone.  But, in the language of the immortal Lincoln, ours is a government "of the people, by the people and for the people."  When, therefore, the people of this state by solemn amendment to the Constitution declared that "the manufacture, distribution and sale of cement and cement products are hereby declared to be works of public necessity and importance in which the state may engage" (Const. art. 13, § 10), we are of the opinion that the taxation authorized by

said chapter is for a public purpose, and that it is not open to the courts to say otherwise.

[6]   Thus far we have considered your inquiry in the light of the provisions of our state Constitution.   It might be urged, as was urged in Green v. Frazier, 253 U. S. 233, 40 Sup. Ct. 2, 499, 64 L. ed. 233, that the act in question violates the Fourteenth Amendment to the federal Constitution.   From a careful study of the decision in that case we are of the opinion, and we believe that the Supreme Court of the United States would be of the opinion if the question came before it, that the act in question does not violate such Fourteenth Amendment.

No other grounds occur to us upon which the bonds in question might be assailed as unconstitutional.   Judge SMITH, being absent from the capital, does not participate in this opinion.

Dated Pierre, S. D., December 29, 1920.

Respectfully submitted.

      JAMES H. McCOY.

      CHAS. S. WHITING,

      SAMUEL C. POLLEY,

      JOHN HOWARD GATES,

          Judges of the Supreme Court of South Dakota.