OAKWOOD VILLA APARTMENTS, INC., *v.* GULU.

1. CONTRACTS—BREACH—INSTALLATION OF HEATING SYSTEM.

   Recovery of damages from defendant heating contractor for breach of contract caused by leaky zone control valves in a heating system must depend upon defendant's failure to install them properly and not upon his negligent selection of them, where there is no showing that valves were of bad design, badly manufactured, improperly manufactured, or faulty.

2. SAME—BREACH—DAMAGES.

   Damages for breach of contract are intended to compensate the injured party sufficiently to put him in as good a position as he would have occupied had the breach not occurred.

3. SAME—STANDARDS—DESIGN—BREACH.

   Contract by which defendant agreed to design a heating system to meet certain standards and to include certain particulars in the design is not breached when the design meets all of the requirements, and plaintiff cannot recover against defendant for cost of proposed changes of design, where faults of system result from installation.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts § 425 *et seq.*
[2–7] 22 Am Jur 2d, Damages §§ 12, 49 *et seq.*
[8] 1 Am Jur 2d, Accord and Satisfaction § 33 *et seq.*
[9] 5 Am Jur 2d, Appeal and Error § 1014.

4. Same—Breach—Heating System—Repairs.

Defendant who contracted to install heating system is liable for work improperly performed in the installation, and it is for the trial court to make factual determinations whether leaks were attributable to defendant, and if so, which repairs were reasonable and necessary to put the system in the condition originally contemplated by the contract.

5. Same—Performance.

Injured party to a contract is only entitled to that to which he had a right under the contract.

6. Same—Breach—Evidence—Replacement—Costs—Proration.

Costs of valves in heating system which had to be replaced 2 or 3 years after installation because of failure where testimony indicated a life expectancy of 3 or 4 years must be prorated as to the unexpired portion of life which plaintiff building owner did not receive because of defendant heating contractor's breach.

7. Same—Breach—Replacement of Parts.

Any method of computation based upon cost of replacement of components improperly installed in heating system by heating contractors, other than prorating unexpired portion of life, would permit injured party to obtain life expectancy of equipment beyond that contemplated by contract.

8. Appeal and Error—Remand—Accord and Satisfaction.

Determination as to whether credit on contract price was intended as an accord and satisfaction of the repairs necessitated by defendant's claimed breach of contract for installation of heating system is ordered on remand.

9. Costs—Neither Party Prevailing in Full.

No costs are allowed where judgment is remanded for further proceedings, neither party prevailing in full.

Appeal from Wayne; Weideman (Carl M.) J. Submitted Division 1 May 4, 1967, at Detroit. (Docket No. 2,282.) Decided March 20, 1968. Rehearing denied June 3, 1968. Leave to appeal denied August 20, 1968. See 381 Mich 772.

Declaration by Oakwood Villa Apartments, Inc., a Michigan corporation, against Mike Gulu to recover damages resulting from defendant's alleged

breach of contract. Judgment for plaintiff. Defendant appeals. Reversed and remanded.

*J. Leonard Hyman* (*Philip Green*, of counsel), for plaintiff.

*Earl D. Ross* (*Louis Rosenzweig*, of counsel), for defendant.

J. H. Gillis, P. J. Defendant Mike Gulu, doing business as Gulu Plumbing & Heating Company, is a heating contractor. On April 24, 1958, a contract[1] was entered into by Gulu and Hampshire Home

[1] The terms of that contract insofar as they are material to this lawsuit provide:

"A forced hot water heating system, base board radiation, and complete design and complete specifications for same to be furnished by the subcontractor to the general contractor to meet latest I. B. R. methods, F. H. A. requirements, and inspection requirements of the city of Royal Oak, said system to conform to the drawings of the buildings as shown in drawings No. 5713. The subcontractor to provide the following:

"Each of 100 apartments shall be zoned with separate thermostat and motorized valves; pumps shall be sized to job and be Thrush, B. & G. or equal; radiation shall be General Automatic, Kritzer or equal with dampers thruout and cover to be from wall to wall; boiler to be sized larger than radiation figured at 200 degrees water and 80 degrees Fahrenheit difference in outdoor-indoor temperature; all apartments shall have 2″ blanket insulation in wall and ceiling with fibre insulation in perimeter of outside walls; boiler shall be National U. S. Radiator or equal;

"All copper piping to be type "L"; all joints underground shall be silver soldered; riser from boiler to be insulated or any other place where pipe can be readily reached, insulation to be asbestos type; controls to be wired so when thermostats do not call for heat, temperature in boiler shall drop to give outdoor temperature control system; provide 2 tube scrapers for each boiler; no pipes to be exposed in ceilings of rooms in apartments; Subcontractor will wire all controls and zone controls, General Contractor to furnish 110 wiring opening only where needed for subcontractor's use; Subcontractor to provide eight 2000 gallon oil tanks, owner to furnish ground hole for each tank; owner to furnish oil for tanks; boilers to be No. 937-OW in apartments A, B, & G, and No. 737-OW in apartments C, D, E, & F for a total of 8 boilers, said boilers to have electronic controls thruout; Subcontractor to provide shut-off valve and individual drain for each apartment; system shall be test checked by the Subcontractor prior to the time owner takes over; Subcontractor shall warrant the system for one year and guarantees that boilers shall meet owner's insurance requirements."

Builders, Inc., a general contractor, whereby Gulu was to design and install a heating system in an apartment complex owned by plaintiff, Oakwood Villa Apartments, Inc. Several problems arose in the heating system and plaintiff brought this action for damages alleging that Gulu breached his contract. Trial before the court resulted in a $9,000 judgment for plaintiff and defendant takes this appeal.

Defendant began work on the contract in 1958 and the system was partially tested during the 1958–59 heating season. Pursuant to an agreed contract modification, the system utilized gas fired boilers with attached pumps to force the heated water through the system. One boiler is located in each of the 8 individual apartment buildings, which contain 100 separate apartments. Each apartment has its own hot water supply and return from the radiator and is thermostatically controlled. The flow of hot water is controlled by a motorized zone control valve which, on signal from the thermostat, automatically opens to allow the flow of hot water or closes to stop the flow.

The first problem encountered with the system was during the 1958–1959 season when some of the control valves "froze" in the open position causing a runaway heat condition in some of the apartments. The excessive heat caused drywall damage and scorching of the walls behind the baseboard radiators requiring repairs and repainting which cost $2,239. Payments on the repair invoices were made on May 15, 1959 and July 9, 1959.

The cause of the problem was determined to be faulty zone control valves. White-Rodgers Company, the valve distributor, replaced all the valves in the system and gave Gulu an allowance for his labor in making the change. After the revalving was

completed, to reassure the plaintiff and Federal
Housing Administration, both the White-Rodgers
Company and Gulu gave their warranties on the
valves from January 1, 1960 to December 31, 1960.

Because of the subsequent valve problems, which
we shall discuss, plaintiff also brought suit against
White-Rodgers Company who in turn filed a third-
party complaint against its own manufacturer-sup-
plier, Enco Products Corporation. Both of these
actions were dismissed by the court at the close of
plaintiff's proofs and no appeal has been taken from
this dismissal.

After the valve problems developed, FHA,
through William Stewart, its construction inspector,
recommended withholding a portion of the contract
price to insure funding of any further heating re-
pairs and set up an escrow for this purpose. Mr.
Stewart testified at trial that, based on the recom-
mendations of FHA mechanical engineers who found
that the system was functioning properly, the escrow
was released in January, 1960. By this date Gulu
had completed the installation.

On February 26, 1960, preparatory to the final
contract payment, Gulu sent a letter to plaintiff[2] in
which he offered a $1,000 credit against his contract
balance because of the repairs made necessary by
the excess heat. The proposed credit was in fact
accepted and deducted from the balance due. Gulu
contends here, as he did at trial, that this credit
constituted an accord and satisfaction of those dam-
ages. In its closing argument at trial, plaintiff

----

[2] "It is further agreed and understood that Oakwood Villa Apart-
ments, Inc., and Hampshire Home Builders, Inc. will back-charge
against our contract price $1000.00 in connection with additional
repairs and charges made to the building because of excessive heats
resulting from the installation of faulty motorized valves.

"We agree to this back-charge and have credited the account
of Oakwood Villa Apartments, Inc. and Hampshire Home Builders,
Inc. in the amount of $1,000.00."

included the drywall repairs and painting in its itemization of damages claiming that the credit was only for wasted fuel due to the excessive heat condition. Plaintiff's president testified that he did not appreciate the full import of Gulu's offer as made in the February 26 letter.

The system operated during the 1959–1960 and 1960–1961 heating seasons but testimony indicates that difficulties were experienced and complaints were received from some of the tenants. The main problems were leaky zone control valves and noise in the system.

In March, 1961, plaintiff retained Mr. E. G. Siegel, a consulting mechanical engineer, to inspect the system and make an evaluation and recommendation regarding any deficiencies. Mr. Siegel prepared 2 detailed reports in March and April, 1961, which were submitted to plaintiff. Plaintiff included in his damages Mr. Siegel's consultation fee of $325.

Mr. Siegel made many recommendations for improving the heating system. He suggested that mounting the valves with the motor down caused any leaks to run into the motor and rust the mechanism, and that the valves should be mounted in the motor-up position. The report contained recommendations for expansion joints in the pipes to alleviate the noise caused by the pipes expanding on the inflow of hot water. Additionally, he made certain findings as to desirable modifications to boiler and water controls and suggested that the boiler pumps be rotated so as to push the water rather than pull it through the heating system.

On direct examination Mr. Siegel stated that the position of the boiler pumps did not make for a bad installation but that they are usually mounted to push the system. Some of the other items referred to were stated by Mr. Siegel to be recommended but not essential. He testified that although the con-

tract called for type "L" copper tubing, he found
that defendant had installed considerable amounts
of type "M" which is a thinner-walled and less ex-
pensive tubing.   He did state, however, that the
type of tubing was only critical during the construc-
tion stage and that both types of tubing would be
satisfactory in this type of system and under the
pressures found in this system.   When asked to ex-
press an opinion on whether Gulu had performed in
a good and workmanlike manner, he declined to do
so stating only that he would have included some
items omitted by Gulu.

On cross-examination Mr. Siegel indicated that
his recommendations were a question of efficiency
rather than functional operation; that at the time
of his investigation the system was operating; and
that most hot water systems make noise.

In October, 1962, plaintiff hired George Girk, do-
ing business as Girk Engineering Company, to make
certain repairs and modifications to the heating
system.   Armed with Mr. Siegel's 1961 reports, Mr.
Girk proceeded to change all 105 control valves, fix
certain leaks which he attributed to faulty soldering
on the installation, rewired certain transformers
and thermostats, rotated the boiler pumps, and
agreed further to service plaintiff's system for a
period from September 1, 1962, to April 30, 1963,
for $40 per month.

Mr. Girk's charges which were included in plain-
tiff's itemization of damages were: 105 new control
valves, $2,262.85; installation of the new valves,
$480; labor to make other repairs on the system,
$389; an item referred to as labor on zone control
($174.38) which according to the exhibits appears to
consist of $100 balance due on zone controls, $65 for
labor and material on transformers, and $9.38 to
move a thermostat.   On the $174.38 item, the $100

balance due appears to be repetitious of the cost and labor on the zone controls. Another $135 itemized by plaintiff included $105 for 5 new valves, which is already included in the cost for 105 valves listed above, and $30 for labor in repair of leaks.

White-Rodgers Company and Enco Products Corporation moved for dismissal at the close of plaintiff's proofs. The only evidence as to the fault of the valves was that they rusted, but there was no evidence as to why they rusted. As the court stated: "There is no showing that it is a bad design, bad manufacture, improper manufacture, or faulty valves." The same finding is also applicable to Gulu in relation to plaintiff's allegation that Gulu was negligent in selecting these particular valves and if Gulu is to be held liable for their replacement, it must depend on his failure to install them properly.

The other major item of damages was $7,575 which plaintiff contended was the cost to make all the additional corrections which Mr. Siegel recommended. At the time of trial, February 1966, these modifications had not yet been undertaken.

The trial judge in announcing his opinion, stated:

"Based on the testimony that the court has heard, the court believes that the plaintiff has established its case by a preponderance of the evidence, and the question now resolves itself into the amount of damages.

"The court is going to award a judgment in round figures, so to speak, as best it can, because the court believes there are some things that may not have to be done to put this installation in proper working order or to compensate for the repairs that have been made and the damages incurred as a result of the faulty installation of the system.

"This system was designed by the subcontractor. He had conversations with Mr. Scholnick. How-

ever, when the contract was reduced to writing, both sides were bound by the contract as written.

"The installation was complained of continually for a period of two years, at least. The work started in the heating season of '58–'59. The lawsuit was started May 10, 1962. The court finds that during that time there was no satisfactory heating system installed upon which a warranty should start. Complaints were continually made about the faulty operation and installation of the heating system.

"The court, after considering all the matters and all the proofs offered, and after hearing arguments of counsel, is of the opinion that the plaintiff has suffered damages for the amounts that he expended and some future amounts that he should put in and should be installed in the system to make it operate according to the contract, and the court therefore awards the plaintiff damages in the amount of $9,000, plus costs."

In assessing damages at $9,000 the trial judge gave no indication of which items he allowed and which he disallowed. Normally in such a case we would simply remand to make the required findings, but in this case, based on the record made, we rule on certain items which are unallowable as a matter of law. Other items shall be referred back to the trial judge for factual determination.

The rule of damages for breach of contract is to compensate the injured party sufficiently to put him in as good a position as he would have occupied had the breach not occurred. *Dierckx* v. *Vulcan Industries* 1968, 10 Mich App 67. Therefore, it is necessary to determine what the parties bargained for and in which respects the performance fell short of expectations.

There are two distinct if not entirely separable provisions to this contract: to design the system and to install the system. Gulu designed this system and would be responsible for any defects in design,

if they are found to render it deficient under the terms of the contract. The contract required Gulu to design a system which would meet latest I. B. R.[3] methods, FHA requirements, and inspection requirements of the city of Royal Oak, and then enumerated certain particulars to be included in the design. There is no evidence that the system or design failed to meet any of the above requirements. The only evidence of variation from the express terms of the contract is the substitution of type "M" for type "L" tubing, but there is no testimony that this substitution constituted a defect in design.

The manifest injustice of going to a contractor to design an inexpensive system and then comparing it to one which an experienced professional engineer would have designed should be apparent on its face. All plaintiff was entitled to was a heating system as specified in section 2 of the contract. Whether this is an optimum system or not, it is all plaintiff bargained for, and all he is entitled to receive. We find no evidence which would support a finding that plaintiff received less than that to which he is entitled and therefore we rule that the $7,575 item for proposed changes is without foundation in the record and not allowable.

Defendant, however, remains liable for work improperly performed in the installation of the system. There was testimony that certain pipes were improperly soldered causing leaks in the lines and in the valves. There should be a factual determination made by the trial judge as to whether the leaks were attributable to Gulu, and if so, which repairs were reasonable and necessary to correct the situation. The only items which we can find pertinent to correcting leaks are $30 and $389 billings from Girk.

_____

[3] Institute of Boiler and Radiator Manufacturers.

We recognize that it was alleged that faulty soldering also led to the leaks which ultimately necessitated the replacement of the zone control valves. This is a question which should, on remand, be resolved by the trial judge.

Mr. Girk testified that when he began working at Oakwood Villa late in 1962 he found 35 of the valves inoperative but replaced the entire 105 to be on the safe side. We believe that in order to hold Gulu for this replacement it must first be determined whether this action by Girk was reasonable and necessary to put plaintiff's system in the condition originally contemplated by the contract with Gulu. Moreover, as we pointed out in *Dierckx, supra,* the injured party to a contract is only entitled to that which he had a right to under the contract. Mr. Gulu testified that the normal life expectancy of a zone control valve is 3 or 4 years. By the time Girk replaced the valves, they had been in for 2 or 3 years. If, for instance, such valves have a 4-year life expectancy, the cost of the valves which it was necessary to replace should be prorated as to the unexpired portion of the life of the valves which was not available to plaintiff because of defendant's breach. Any other method of computation based on the cost of replacement of certain components would permit the injured party to obtain life expectancy or quality of equipment beyond that contemplated by the contract.

As to the claim of accord and satisfaction on the drywall repairs, we remand for specific findings by the trial judge as to the intent of the parties and the construction of the February 26 letter with the subsequent $1,000 credit against the contract. We further point out that in the present trial proceedings it does not appear that defendant was given credit for the $1,000 in computing damages. Since other questions are likewise being remanded for

specific findings of fact, the trial judge should also make a determination on the record as to whether the parties intended an accord and satisfaction of the repainting and drywall repairs.

The judgment of the trial court is reversed and remanded for additional findings consistent with this opinion. No costs, neither party prevailing in full.

T. G. KAVANAGH and WEIPERT, JJ., concurred.