**FULLERTON LUMBER COMPANY, Wessington Springs, South Dakota, Plaintiff and Appellant,**

v.

**Lloyd REINDL, Defendant and Appellee.**

**No. 13818.**

Supreme Court of South Dakota.

Argued Nov. 18, 1982.

Decided March 23, 1983.

---

1. For a brief history of long-arm jurisdiction, see 69 Michigan Law Review 300 (1970).

**294**

John R. Steele of Steele & Eichstadt, P.C., Plankinton, for plaintiff and appellant.

Ronald K. Miller of Miller, Miller & Sebastian, Kimball, for defendant and appellee.

FOSHEIM, Chief Justice.

Fullerton Lumber Company (appellant) sued Lloyd Reindl (appellee) for money owed; appellee counterclaimed and recovered damages for death loss of pigs due to a

leaking roof on a farrowing barn Fullerton built for him, for the cost of repairing the roof, and prejudgment interest on both awards. Fullerton appeals. We affirm in part, reverse in part and remand.

The first issue is whether certain trial court findings are clearly erroneous. The trial court found that appellee asked appellant if it could build him a pole barn with a calf shelter-type flat roof to be used mainly for farrowing pigs.[1] The trial court found that appellant, through its manager, Don Werley, told appellee that snowloads on such a roof might cause problems, but otherwise he was not concerned about the design.[2] The trial court found that appellant approved the design and construction of the farrowing barn and agreed to build it for appellee and that Mr. Myron Lang, who had done construction work for appellant during the past ten years, was engaged by appellant to build the barn in late 1975 or early 1976.[3] The trial court found that by virtue of the contract appellant warranted that the barn would be built in a workmanlike manner and that it would be suitable for farrowing pigs. The trial court found, however, that the warranty of fitness was materially breached because the roof leaked due to faulty design. Although appellee claimed damages for dead pigs from the first farrowing in the Spring of 1976, to the time of trial in 1981, the trial court determined that appellee should have mitigated his damages after the Spring of 1977. The trial court found the leaking roof caused appellee to lose thirty pigs in the Spring of 1976, thirty pigs in the Fall of 1976, and thirty pigs in the Spring of 1977. Appellee was awarded $2,730 for the total loss. The trial court allowed appellee $1,728 for roof repair costs.

Appellant disagrees with the trial court's finding that it approved the design and construction of the barn. Appellant argues that the roof was designed by appellee, that appellant warned him it was not a good design, and that appellant is therefore not liable for damage due to the roof's design. Appellant relies on *Reif v. Smith*, 319 N.W.2d 815 (S.D.1982).

In *Reif* the plaintiff contractor agreed to build a home for defendants using a draftsman's blueprints supplied by defendants. There are no facts in *Reif* that defendant brought the blueprints to the contractor and asked him if he thought they were good plans. The facts merely indicate that the contractor agreed to follow the blueprints provided by defendants. The blueprints proved to be woefully inadequate. We held that defendants should not receive an offset for additional work required due to the inadequate blueprints which they provided. We said:

> [A] construction contractor who has followed plans or specifications furnished by the contractee, his architect, or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results ... solely from the defective or insufficient plans or specifications, *in the absence of* any negligence on the contractor's part, or *any express warranty by him as to their being sufficient or free from defects.*

319 N.W.2d at 818, *quoting* Annot., 6 A.L. R.3d 1394, 1397 (1966) (emphasis added).

■ The present facts are different. Appellee had an idea of a farrowing barn of pole barn construction with a flat roof and he described his plan to Mr. Werley and asked for his opinion. The trial court found that Mr. Werley told appellee that aside from a possible snowload problem, his idea was feasible. These findings are supported by Mr. Werley's testimony.

1. At oral argument appellant stated it builds dozens of buildings a year but had never before built one with this particular design.

2. The parties appear to agree that snowload has never been a problem. The roof leaks occurred during spring and fall rains.

3. At trial and in its brief appellant argued that the contract to build the barn was actually between Mr. Lang and appellee; but at oral argument it conceded the evidence supports the trial court's finding that Mr. Lang was employed by, and working for, appellant.

Q. (Mr. Miller) It's true you knew what Mr. Reindl was building this building for, didn't you?

A. Yes.

Q. And you agreed it could be built for that purpose?

A. For a combination hog, cattle and machine shed, yes.

Q. Mr. Werley, you're aware that the normal consequences of a leaky roof on farrowing sows would be sick or dead pigs, aren't you?

A. Yes.

Based on this testimony, appellant expressly warranted that appellee's idea was feasible as a roof for a farrowing barn and, under the rule quoted from *Reif,* appellant is liable for loss or damage resulting from the roof's design.

Appellant also disputes the trial court's finding that the design of the roof caused the leaks. Appellant argues that the record contains mere speculation, but no evidence, on the cause of the leaks. In this vein appellant disputes the trial court's finding that the proposed method of repair was reasonable in light of the claimed absence of evidence on the cause of the leaks. Appellant also argues that the trial court's finding that appellee was not required to mitigate his damages until after the Spring of 1977 farrowing is clearly erroneous. Appellant claims appellee should be denied any damages for loss occurring after the Spring of 1976.

■ A careful review of the evidence does not impress us with a definite and firm conviction that the trial court erred in finding that appellant approved the roof design, that the design caused the leaks, that the method of repair was reasonable, and that appellee should have mitigated his damages after the 1977 spring farrowing. The evidence upon which these findings are based is either conflicting or uncontradicted in appellee's favor. Under these circumstances we must defer to the trial judge who observed the witnesses under oath and was therefore in a better position than this

court to judge their credibility. *In Re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970); SDCL 15–6–52(a).

■ The last issue is whether the trial court erred when it awarded appellee prejudgment interest on the damages for dead pigs and for repairing the roof. SDCL 21–1–11 reads:

Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

Appellee testified that he did not keep records of pig deaths due to the leaking roof but that he estimated his loss at twenty-five to thirty-five pigs each spring and fall farrowing season. He submitted evidence of damage based on a loss of twenty-five, thirty, or thirty-five pigs. The trial court found the loss was thirty pigs and adopted appellee's loss figure for that number. It follows appellee is not entitled to prejudgment interest for the lost pigs because his damages were not certain until the trial court made that finding. *State for the Use of Farmers State Bank v. Ed Cox and Son,* 81 S.D. 165, 132 N.W.2d 282 (1965).

■ The trial court allowed appellee $1,728 for roof repairs, based on a price quoted to appellee on July 27, 1981. In order to receive prejudgment interest on this damage award, appellee must prove the certain or ascertainable repair cost at the time of vesting, in this case when he should have mitigated his damage. The only evidence in the record is what roof repairs would cost in 1981. The cost of repairing the roof at the time of vesting was not proved. We therefore hold that appellee is not entitled to prejudgment interest on the damage award for repairs.[4] *See, Beka v. Lithium Corporation of America,* 77 S.D. 370, 92 N.W.2d 156 (1958).

---

4. Appellant does not seem to claim the repair costs are unreasonable.

We affirm the judgment except for the award of prejudgment interest. We remand for entry of judgment consistent with this opinion.

WOLLMAN, DUNN, and MORGAN, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice, (dissenting).

Reindl and Fullerton entered into an oral agreement whereby Fullerton would supply the materials to build a building in accordance with Reindl's design. Testimony reflects that Reindl's chief desire was to obtain an inexpensive building. Instead of purchasing or having constructed a hog farrowing barn, Reindl decided to build a 24′ by 72′ pole shed sheeted with corrugated steel. Reindl independently chose an unorthodox roof design which was essentially flat because it was cheaper than the type of roof customarily installed on farrowing barns. Reindl privately and separately contracted with third parties for electrical work, a heating system, and plumbing. Collateral to the agreement between Fullerton and Reindl, Fullerton sought and obtained the services of one Myron Lang for the purpose of assembling the building per the design of Reindl. Fullerton furnished the materials for the frame, siding, and roof of the building. Once again, acting as his own general contractor and architect, Reindl separately contracted with the said Myron Lang to pour and finish all concrete work for the building.

The trial court found that the building was constructed in a good workmanlike manner and the materials employed in the construction of the building were without defect. Several months after the building was completed, the roof began to leak. The trial court found that, indeed, the roof leaked and that the leakage was the result of the defective design. The majority opinion and I part company on the responsibility of the defective design. When an essentially flat roof on a structure is constructed in a good and workmanlike manner in conformance with the design furnished by the owner, the contractor is not liable to the owner for damage resulting from water leaking into the building due to the defective design. *Sunbeam Construction Co. v. Fisci,* 2 Cal.App.3d 181, 82 Cal.Rptr. 446 (1969). The majority opinion fails to recognize this rule of law, and to apply it to this set of facts, as did the trial court. For further analysis to support this dissent, *see generally,* Annot., 6 A.L.R.3d 1394 (1966). As for South Dakota case law, I believe *Reif v. Smith,* 319 N.W.2d 815 (S.D.1982), is dispositive of this case. We held in *Reif* that a contractor who follows the design supplied by the building owner is not responsible for damages due to the design, unless the contractor was negligent or expressly warranted the design. Negligence on Fullerton's behalf was neither pled, proved, or found by the trial court. Reindl conceived of the unusual design for his hog farrowing barn with the goal in mind of saving on construction costs. He chose a pole shed building. South Dakota's climate, affected by its latitude, elevation, terrain, and remoteness to mild ocean air, does not permit the farrowing out of hogs in a pole shed building on an all-year-round basis. Put another way, little pigs die when they become cold and wet. Hog farrowing barns, so that pigs are safely born with adequate protection during varying seasons, have become sophisticated and expensive. Reindl knew this. Reindl solicited price quotations for materials to build this barn and he chose Fullerton to do the job. In summary, the evidence reflects that Reindl conceived of a shortcut to farrow out sows in a cheap building, he designed a cheap building, he paid for a cheap building, and he got a cheap building. Having found out that his cheap building design did not hold up to the elements of South Dakota's climate, he literally seeks in law to impose the costs of improving this cheap building and the burden of his swine losses while using it, on Fullerton.

Not for one minute do I accept the legal conclusion that under the state of this record, Fullerton warranted Reindl's design as producing a good hog farrowing barn. Nor do I accept the trial court's finding that

298

"Fullerton approved" the design. The trial court hung its hat on such a theory and it is unsupported in fact. The design was the concept of Reindl and it was Reindl who approved it and insisted upon it. On direct examination, Don Werley, the manager of Fullerton Lumber, testified that he told Reindl of possible leakage problems:

Q. Now, to the best of your recollection, Mr. Werley, relate to the Court the conversation in as much detail as possible that you had with Mr. Reindl when he first talked to you about this building.

A. When he first came in, he was talking about his father—him and his father had just built a calf shelter in the yard, and he wondered if the same type of building could be used for housing hogs.

We talked about it, commenting on whether the 24-foot span would be too great. And I told him I was real afraid that snow would take it down, and, also, the fact that it was *an awful low pitch to drain water.* (Emphasis supplied.)

Later, in cross-examination, Mr. Werley was confronted with his deposition statement that Mr. Werley only mentioned the snow load problem with Reindl. Mr. Werley reaffirmed his statement that he told Reindl of possible leakage problems and noted that during his deposition he was responding to a question regarding structural problems rather than drainage problems with the pole shed building. I find the trial court's findings of facts and conclusions of law clearly erroneous and I am of the definite and firm conviction that a mistake was made at the lower court level.

Under the lower court and the majority opinion's holding, Reindl recovers for 60 pigs which died in the spring of 1976 of a value of $1,875; and likewise, Reindl recovers $855 for 30 pigs which died in the spring of 1977. This totals $2,730 damages for a leaking roof designed by Reindl. Now, mind you, Reindl himself testified that he used this pole shed building as a hog farrowing barn from the spring of 1976 through the spring of 1981. Lo and behold, he further testified for each year he used the building, he experienced problems with a leaking roof, and as a result, his pigs would die. Yes, Reindl testified that he repeatedly contacted Fullerton requesting that Fullerton fix the leaking roof (rather than to crawl up upon the roof and fix it himself). I submit that when the roof leaked, it behooved Reindl to repair the leak and to not suffer more little pigs to perish in this pole shed building that was inadequately designed. Reindl did not mitigate his damages. Everyone owes a duty to exercise some common sense. When Reindl testified that he lost 30 pigs each time his sows farrowed, once in April and once in October of each year (spring of 1976 through the spring of 1981), I submit that poor judgment was exercised and that this lumber company should not be responsible for the loss of any of Reindl's poor judgment and failure to mitigate his damages. As we correctly quoted many years ago in *Gardner v. Welch,* 21 S.D. 151, 157–8, 110 N.W. 110, 112–3 (1906):

"The law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertion to render the injury as light as possible. If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him. This is a practical duty under a great variety of circumstances, and, as the damages which are suffered by a failure to perform it are not recoverable, it is a duty of great importance." 1 Sutherland, 148.

*See also, Stadheim v. Becking,* 290 N.W.2d 273 (S.D.1980).

I note that this Court further affirms the trial court on an award of damages for breach of contract in the amount of $1,728. This figure represents the purported reasonable costs of repair to the roof. It logically follows that since Reindl designed the roof, Fullerton should not be responsible for repairing Reindl's defective design. This is particularly true in light of the testimony that Reindl was apprised that there would

be drainage problems because of the roof's design.

Damages awarded for the repair of the roof approximate one-third of the cost of this building. Considering that Reindl recovers $2,730 for damages for lost baby pigs, Reindl ends up with a 24' by 72' building on his farm for virtually nothing. I consider this manifestly unjust. An owner who instructs that an inexpensively designed real estate improvement be made does not bargain for and is not entitled to receive an optimal improvement such as would be designed by an experienced engineer, therefore, the owner is not entitled to recover from the contractor anything beyond what the contract called for, a less than optimum structure. *Oakwood Villa Apartments, Inc. v. Gulu,* 9 Mich.App. 568, 157 N.W.2d 816 (1968). Whatever happened to the old adage "You get what you pay for"?