ARCON CONSTRUCTION CO., INC., a Minnesota Corporation with its principal place of business at Mora, Minnesota, Plaintiff and Appellee,

v.

SOUTH DAKOTA CEMENT PLANT and South Dakota State Cement Plant Commission; Edwin Gaiser of Rapid City, Roger Prunty of Brookings, Al Sandvig of Aberdeen, Richard Sayre of Sioux Falls, Joe Simmons of Rapid City, Bill Stake of Lennox, and Tom Zeller of Rapid City, the duly appointed and acting Commission members; William Scanlon of Rapid City, individually, and as an employee, officer and agent of Plant and Commission; and Michael Holeton of Rapid City, individually and as an employee, officer and agent of the Plant and Commission, Defendants and Appellants.

Nos. 14139, 14140, 14147 and 14148.

Supreme Court of South Dakota.

Argued Oct. 25, 1983.

Decided May 2, 1984.

See also S.D., 343 N.W.2d 795.

Banks & Johnson, Rapid City, for defendants and appellants.

DUNN, Justice (on reassignment).

The South Dakota Cement Plant and the South Dakota Cement Plant Commission (referred to collectively as "the cement plant") appeal a judgment entered against them for their breach of two contracts for the sale of cement to Arcon Construction Co., Inc. (Arcon). We affirm in part, reverse in part, and remand.

The first contract at issue here involved the sale of cement to Arcon for a project on Interstate 29 north of Watertown, South Dakota. The other contract involved the sale of cement for Arcon's paving project on Highway 281 near Aberdeen, South Dakota. Both contracts called for the delivery of cement during construction year 1978. However, due to a severe cement shortage in 1978, the cement plant failed to deliver the cement as called for under the contracts. As a result, Arcon was not able to perform work on the projects until the 1979 and 1980 construction seasons.

Arcon commenced its action for breach of contract on April 17, 1980; the cement plant counterclaimed for damages caused by Arcon's failure to use certain amounts of cement which were delivered to Arcon. A jury trial began on October 6, 1982. After hearing the evidence and deliberating for eight days, the jury returned a verdict for Arcon in the amount of $1,175,974.00, and a verdict for the cement plant in the amount of $89,089.00 on its counterclaim.

Numerous issues are raised by the parties in this appeal, including the following: 1) Is Arcon's lawsuit barred by the principle of sovereign immunity? 2) Is Arcon's lawsuit barred by the running of the statute of limitations? 3) Did the trial court properly instruct the jury as to the cement plant's contractual and statutory defenses? 4) Did the trial court properly instruct the jury as to the proper measure of damages for contractor-owned idle equipment? 5) Did the trial court abuse its discretion when it taxed costs against the cement plant? 6) Is Arcon entitled to prejudgment

Ronald G. Schmidt of Schmidt, Schroyer, Colwill & Zinter, Pierre, for plaintiff and appellee.

Tom Lehnert and Wayne F. Gilbert of Lehnert & Gilbert and Ronald W. Banks of

interest on the damages awarded by the jury?

## I

The threshold question in this appeal is whether the doctrine of sovereign immunity extends to the cement plant. Article III, section 27 of the South Dakota Constitution provides: "The Legislature shall direct by law in what manner and in what courts suits may be brought against the state." Accordingly, we have consistently held that it is the exclusive province of the legislature and not the courts to abrogate or limit the doctrine of sovereign immunity. In the absence of an express statutory waiver, we strictly adhere to this constitutionally mandated doctrine. *Kringen v. Shea*, 333 N.W.2d 445 (S.D.1983); *Merrill v. Birhanzel*, 310 N.W.2d 522 (S.D. 1981); *High-Grade Oil Co., Inc. v. Sommer*, 295 N.W.2d 736 (S.D.1980); *Arms v. Minnehaha County*, 69 S.D. 164, 7 N.W.2d 722 (1943).

The cement plant is clearly an arm of the state. Article XIII, section 10 of the South Dakota Constitution declares that the manufacture, distribution, and sale of cement and cement products is a function of state government. Not only is such activity for a public purpose, *Eakin v. South Dakota State Cement Commission*, 44 S.D. 268, 183 N.W. 651 (1921); *In re Opinion of the Judges*, 43 S.D. 648, 180 N.W. 957 (1920), but, when this cause of action arose in 1978, SDCL 5–17–2.1 specifically provided: "The state cement commission and the state cement plant under its control shall comprise a principal department of state government." * It follows that in pursuing its cement plant operation, the state retains its sovereign status.

Even though the cement plant is an arm of the state, Arcon argues that the legislature has waived immunity for suits arising out of cement plant contracts, especially those within the scope of the Uniform Commercial Code (UCC), SDCL title 57A. The trial court reached a waiver of immunity conclusion under a non-UCC theory based on statutory construction and constitutional interpretation. We do not reach all the waiver of immunity considerations noted by the trial court. We do find, however, for the following reasons, that when the legislature enacted the UCC it expressly waived sovereign immunity for the cement plant whenever the cement plant enters into contracts for the sale of goods.

First, all transactions in goods clearly fall within the provisions of UCC–Sales. SDCL 57A–2–102. The contracts which formed the basis for this lawsuit involved the sale of cement. Cement is "goods" under UCC–Sales. SDCL 57A–2–105(1). Consequently, the type of transaction engaged in between Arcon and the cement plant is governed by the UCC.

Second, the UCC provisions expressly apply to the state. In its general definitions, the UCC defines "organization" to include "government or governmental subdivision or agency." SDCL 57A–1–201(28). Because it is a governmental agency, the cement plant is an organization within the meaning of the UCC. As an organization, the cement plant is a "person" under SDCL 57A–1–201(30), and, as a "person who sells or contracts to sell goods," it is a "seller" within the context of UCC–Sales. SDCL 57A–2–103(1)(d). *See Northern Helex Company v. United States*, 455 F.2d 546 (Ct.Cl.1972), which applied UCC provisions to a sales contract between the federal government and a private company; and *Shea-Kaiser-Lockheed-Healy v. Dept. of W. & P., Etc.*, 73 Cal.App.3d 679, 140 Cal. Rptr. 884 (1977), which held that a municipal water department was subject to the UCC in a sales transaction.

Third, the UCC grants a buyer specific rights and remedies against a breaching seller, and these rights include lawsuits.

---

* This section was superseded by 1979 S.D.Sess.L. ch. 352, § 14–15, which abolished the state cement commission and created a state cement plant commission within the department of commerce. *See* SDCL 5–17–2 and 5–17–2.3. The change does not, in our opinion, alter the capacity of the cement plant as an arm of state government.

When, prior to the first delivery, the cement plant informed Arcon that it would not be able to deliver the contracted fifteen carloads of cement per day, Arcon, as an aggrieved party whose contract had been substantially impaired in value, was empowered by SDCL 57A–2–610 to resort to any of the enumerated remedies for anticipatory repudiation. SDCL 57A–1–106(2) expressly permits an action to pursue these remedies: "Any right or obligation declared by this title is enforceable by action unless the provision declaring it specifies a different and limited effect." The word "right" includes remedies. SDCL 57A–1–201(36). Therefore, Arcon was entitled to maintain an action against the cement plant to enforce UCC–Sales remedies which became available upon breach of the contracts.

Even though, by legislative enactment of the UCC, the people have waived cement plant contract immunity, suit is still potentially obstructed by article XI, section 9 of the South Dakota Constitution, which provides, in part: "No indebtedness shall be incurred or money expended by the state, and no warrant shall be drawn upon the state treasurer except in pursuance of an appropriation for the specific purpose first made." Based upon this section, we have concluded that unless an appropriation has been made for the specific purpose of a lawsuit, a court is without jurisdiction to render judgment. *See G.H. Lindekugel & Sons, Inc. v. South Dakota St. Hy. C.*, 87 S.D. 32, 202 N.W.2d 125 (1972); *Griffis v. State*, 68 S.D. 360, 2 N.W.2d 666 (1942).

However, article XI of the South Dakota Constitution must be interpreted in light of article XIII, sections 10 and 11, which authorize the state to engage in the cement business. Article XIII, section 11 provides: "The state may pledge such cement plants and all of the accessories thereto, and may pledge the credit of the state, to provide funds for the purposes enumerated in § 10 of this article, *any provision in this Constitution to the contrary notwithstanding*." (emphasis added). Except for subject matter, article XIII, section 11 is identical to article XIII, section 13, which authorized the state to fund its electric power enterprises by pledge of those assets. In the case of *In re Opinion of the Judges*, 43 S.D. 635, 177 N.W. 812 (1920), we recognized the supremacy of the electric power funding provision over conflicting constitutional provisions. We stated:

It is our opinion that by the provisions of this section *the people of the state intended to take the provisions of article 13, § 12, out from the operation of any other section of the Constitution*, including the debt limit of one-half of one per cent. The adoption of said section 13 was a setting apart of this form of internal improvement from the provisions regulating internal improvements generally. To hold otherwise would render the language of said section 13 practically meaningless ... The clear purpose of article 13, § 13—else there was no purpose—was to give the Legislature a free hand in carrying out the provisions of article 13, § 12, *unhampered by any other provision of the Constitution.* [Emphasis added]

Id. at 643–644, 177 N.W. at 814–815.

■ Applying the foregoing rationale to the parallel constitutional provisions authorizing the creation of the state cement plant, we hold that, by supplementing article XIII, section 10, with article XIII, section 11, the people of the state intended to take the provisions of section 10 out from the operation of any other constitutional provision which would otherwise obstruct or hamper the enumerated purposes of the cement plant: the manufacture, distribution, and sale of cement and cement products. Such an obstructing provision is article XI, which, if applied here, would make article XIII, section 11 meaningless. How can the state pledge its credit for cement plant operations if its credit obligations are not legally enforceable, or what business would contract with the cement plant if the cement plant is shielded from satisfying its contractual obligations? There can be no pledge of state credit without an obligation which is legally enforceable against the state. *Wilmington Med. Ctr., Inc. v.*

*Bradford,* 382 A.2d 1338 (Del.1978); *Wis. Solid Waste Recycling Authority v. Earl,* 70 Wis.2d 464, 235 N.W.2d 648 (1975).

## II

Having determined cement plant contract liability and its exemption from the appropriation requirement, we next examine whether this action is barred by the running of the applicable statute of limitations. This cause of action accrued at the time of the 1978 breach, SDCL 57A-2-725(2); Arcon did not commence its action until April of 1980. The cement plant maintains that the applicable statute of limitations is SDCL 21-32-2, which states: "Action on any claim on contract ... against the state shall be commenced within one year after same has arisen." We disagree.

■ SDCL ch. 21-32, by its own terms, does not apply to claims involving the cement plant. Chapter 21-32 sets up an administrative procedure for consideration of claims against the state in cases where no appropriation exists for such claims. SDCL 21-32-3. If an administrative commission finds the claim to be meritorious, then the legislature can *appropriate funds* to settle the claim, as long as the claim was brought within one year. SDCL 21-32-7; 21-32-2. The cement plant, on the other hand, is an independent economic entity for which *no* funds are to be appropriated; the cement plant is to exist financially solely on proceeds from its own activities. SDCL 5-17-27. Since the "no appropriation" provision of SDCL 5-17-27 is clearly contrary to the method of settling claims in SDCL ch. 21-32, the statute of limitations in SDCL 21-32-2 should not be applied.

■ Furthermore, as we recognized above, this case involves a sale of goods, a subject dealt with under the provisions of the UCC. Therefore, one must look to the UCC to find an appropriate statute of limitations. The UCC specifically states that "[a]n action for breach of *any contract for sale* must be commenced within four years...." SDCL 57A-2-725(1) (emphasis added). The UCC also speaks to any conflicts between its provisions and other ar-

eas of the law, such as a conflict between a UCC statute of limitations and a statute in SDCL ch. 21-32. SDCL 57A-1-103 provides: "Unless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." In other words, general principles of law may only supplement the UCC to the extent they are not displaced; they will not be applied where they conflict with particular provisions of the UCC. *Kelly v. Miller,* 575 P.2d 1221 (Alaska 1978); *Palmer v. Idaho Peterbilt, Inc.,* 102 Idaho 800, 641 P.2d 346 (Idaho App.1982); *Pioneer State Bank v. Johnsrud,* 284 N.W.2d 292 (N.D.1979); *Pacific Products v. Great Western Plywood,* 528 S.W.2d 286 (Tex.Ct. Civ.App.1975).

Since the UCC's four-year statute of limitations conflicts with the one-year statute at SDCL 21-32-2, and since this case involves a sale of goods under the UCC, the four-year statute must be applied. Arcon's cause of action was brought well within this four-year limit and thus is not barred by the statute.

## III

The cement plant next contends that the trial court failed to properly instruct the jury as to the cement plant's contractual and statutory defenses. These defenses involved the following allegations: 1) the work quotation given by the cement plant to Arcon in 1977, which contained a price quote and the words "shipments will be made according to product availability," is a part of the contract and thus should remove the cement plant's liability for any cement shortages; 2) the "product availability" term was part of the contract by way of course of dealing and usage of trade; and 3) the cement plant was excused from performance due to commercial impracticability.

■ As for the first defense, it is true that the work quotation sent by the cement plant to Arcon contained a "product availability" term. However, the work quotation expired by its own terms on October 1,

1977. Arcon did not submit its purchase order for the cement involved in these contracts until March 30, 1978; and when the cement plant accepted Arcon's purchase order, no conditions on product availability were stated. Therefore, due to expiration of the work quotation, the express term on product availability was properly disregarded by the trial court and the cement plant was not entitled to an instruction regarding such an express term.

■ As for the second defense, the facts in this case seem clear that even though there was no express product availability term in the contracts, product availability was a condition in all cement plant dealings with its customers. Therefore, product availability was a course of dealing and usage of trade, as defined in SDCL 57A-1-205(1) and (2). SDCL 57A-2-202(a) (the UCC parol evidence rule) states that written contracts can be explained or supplemented by course of dealing and usage of trade. Because of the UCC parol evidence rule, the cement plant argues that its contracts with Arcon should be supplemented with the product availability term and the trial court should have properly instructed the jury to that effect.

■ A review of the jury instructions given by the trial court reveals that the jury was properly informed of this UCC defense argued by the cement plant. The instructions accurately stated the language of SDCL 57A-1-205(1) and (2) and SDCL 57A-2-202(a) and were not misleading. It is true that the instructions given by the court were general in nature, not applying the law to the specific facts to the same extent as the cement plant's proposed instructions. However, the instructions as given meet the requirement set forth by this court: jury instructions are adequate if, when considered as a whole, they correctly state the law applicable to the case. *Black v. Gardner*, 320 N.W.2d 153 (S.D. 1982). While the instructions on this issue could have been drawn more artfully, they did correctly state the law upon which the cement plant relied for its defense.

The third defense argued by the cement plant was grounded in SDCL 57A-2-615(a), which states that nondelivery by a seller is not a breach of contract if performance was made impracticable by certain occurrences or because of government orders. The cement plant contends that the instructions on this issue were incomplete and failed to properly state the law.

■ Contrary to the cement plant's claims, the instructions did accurately state the law of SDCL 57A-2-615(a), as well as the interpretation of that statute given by this court in *Olson v. Spitzer*, 257 N.W.2d 459 (S.D.1977). Again, the cement plant's proposed instructions may have applied the law to the specific facts in a better fashion than did the instructions given by the trial court, but the instructions as given correctly stated the law and were not misleading. Therefore, no prejudicial error occurred.

## IV

The next issue on appeal concerns the question of the proper measure of damages for breach of the contracts. Due to the cement plant's failure to deliver the cement as agreed upon, numerous pieces of Arcon's equipment which were scheduled to be used on the two highway projects were forced to remain idle. The trial court instructed the jury that fair rental value was the measure of damages for idle equipment. Using that instruction, the jury determined Arcon was entitled to $753,998.00 for equipment idled due to the cement shortage. The cement plant maintains that the trial court's instruction required the jury to award damages based upon an improper measure, especially when one considers that Arcon's bid figures for equipment costs were much lower than costs calculated using blue book rental rates; these blue book rates were allowed as evidence of fair rental value. For example, Arcon's bid on the Interstate 29 project includes equipment costs of approximately $143,000.00; however, using blue book figures, the cost estimate rises to $1,188,-524.52. The question to be decided on appeal then is this: what is the proper meas-

ure of damages when a supplier breaches its contract with a contractor, thus causing the contractor's equipment to be idled?

The law on this question is not clearly settled. On the one hand, there is persuasive authority for Arcon's position that rental value is the proper measure of damages when equipment is idled. Of particular importance is *Hallett Construction Co. v. Iowa State Highway Com'n*, 261 Iowa 290, 154 N.W.2d 71 (1967), a case factually similar to the case at hand, in which the court approved the use of a rental guidebook to determine damages. *See also Anders v. State*, 42 Misc.2d 276, 248 N.Y.S.2d 4 (1964); *Garofano Const. Co. v. State*, 183 Misc. 1080, 52 N.Y.S.2d 186 (1944); 5 Corbin on Contracts § 1094 (1964).

On the other hand, some courts are not satisfied with the simple application of rental rates as a measure of damages. In *L.L. Hall Construction Company v. United States*, 379 F.2d 559, 567 (Ct.Cl.1966), the court stated: "Is not the best evidence the actual costs? After all, these rate manuals are only guides and estimates based on national averages and subject to many adjustments." The court in *L.L. Hall Construction Company* decided that absent proper records on actual costs, the fair measure of damages for idled equipment is the acquisition cost of the equipment applied to a formula in an ownership expense manual, reduced by fifty percent for idle time. *Id.* at 568. The Montana Supreme Court, in *Laas v. Montana State Highway Commission*, 157 Mont. 121, 483 P.2d 699 (1971), stated that the admission of a rental rate book was error since use of the book put the burden on the defendant to disprove that which the plaintiff had not proven. This error was found to be harmless, though, since the jury scaled down the damages by more than one-half. In *W.G. Cornell Co., Etc. v. Ceramic Coating Co.*, 626 F.2d 990 (D.C.Cir.1980), the court applied rental values as the measure of damages, but only as long as it did not result in unreasonable damages.

This court has never dealt with the precise question raised here, although one decision dealt with a similar matter. In *Landeen v. Yonker, Inc.*, 84 S.D. 600, 175 N.W.2d 50 (1970), we held that one who owns a piece of property, such as construction equipment, has the right to use it; damages are awarded for interference with this right; these damages are usually measured by the rental value of the item involved. It is important to note, however, that *Landeen* did not involve the question of idled equipment; it dealt with equipment that had been damaged, forcing the owner to rent equipment if he was to keep working. In the present case, Arcon never needed to rent extra equipment to keep operating; Arcon simply could not use its own equipment due to lack of supplies. Also of importance to this issue is SDCL 21–1–5, which states, in pertinent part: "no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides...."

A careful consideration of these authorities leads us to conclude that rental rates, such as those in the blue book, may be used as a *guide* to show damages resulting from idled equipment, providing they do not result in an unreasonable amount of damages. Of course, determining whether an amount is reasonable or unreasonable is the most difficult question. However, it is safe to say that when the blue book projects a cost for equipment which is ten times the amount of the figure the contractor used in his bid, as is the case here, the blue book amounts are unreasonable. Since the jury award in this case is far more than Arcon would have received for equipment costs under its bid, had it completed the project on time, we find the award to be unreasonable and we reverse on the issue of damages. SDCL 21–1–5.

In order to give the trial court some guidance on retrial of the damage issue, we suggest the following:

1) Blue book figures may be admitted by the trial court in its discretion if the court determines that this evidence would aid the jury on the issue of damages under the facts of this case.

2) If the blue book is admitted, it should be with the following admonitions to the jury: a) Any sum allowed must be reasonable and should be premised in the first instance on an allocation of the cost of equipment for the period involved, based on the figure Arcon submitted for cost of equipment in its bid. b) This may be supplemented by evidence of other continuing costs of owning the equipment during the period it remained idle, as long as such costs can be proven with reasonable certainty. Examples of such costs include, but are not limited to, security, mainte-nance, taxes, interest on investment, etc. c) This may be further supplemented by a showing, if any, of lost profits during the period the equipment was idle, as long as the profits can be proven with reasonable certainty. d) All of the factors outlined above must be counter-balanced by any showing of decreased costs which flow naturally from non-use of the equipment.

Keeping these guidelines in mind, the jury should be able to come up with a figure which is not unreasonable, and yet will fairly compensate Arcon for its equipment which remained idle due to the cement plant's breach of contract.

 As for issues IV through VIII raised in the cement plant's brief, our holding on the issue of use of the blue book and the need for retrial on the damages question makes a detailed discussion of these issues unnecessary. We do note, however, that Arcon may on retrial submit evidence as to increased costs incurred in the 1979 and 1980 construction seasons over against what would have been incurred in 1978, as long as such increased costs can be proven with reasonable certainty.

### V

The cement plant's final contention is that the trial court abused its discretion when it taxed costs against the cement plant. Following the jury verdict, Arcon filed a notice for taxation of costs, seeking reimbursement in the amount of $47,460.34. The cement plant objected to portions of this request. After a hearing on the matter and the filing of supplemental documentation by Arcon, the trial court awarded costs to Arcon in the amount of $20,639.95. The specific items taxed against the cement plant which are in dispute on appeal are: 1) attorneys' traveling expenses associated with the taking of depositions; 2) witness fees in an amount in excess of that set by statute; 3) expert witness fees in an amount in excess of that set by statute; 4) expenses of obtaining daily trial transcripts; 5) deposition related expenses; and 6) copying and printing expenses.

 Our statutes provide that the prevailing party in a civil action may be allowed to recover "costs." SDCL 15-6-54(d) and SDCL 15-17-1. While the trial court is afforded some discretion in awarding costs, *Grady v. Felker*, 85 S.D. 477, 186 N.W.2d 509 (1971), it is an area in which a trial court must use cautious restraint within the guidelines of the statute. *Wagner v. Wagner*, 83 S.D. 565, 163 N.W.2d 339 (1968). A party to litigation incurs many expenses, but not all of those expenses are to be regarded as costs; therefore, a party may recover as costs only those items which are specifically mentioned by statute. *Wagner, supra; State Highway Commission v. Hayes Estate*, 82 S.D. 27, 140 N.W.2d 680 (1966).

Of particular importance in the present case is SDCL 15-17-4, which states:

> In all cases where a party is allowed to recover costs the clerk must also tax as a part of the judgment the allowance of such party's witnesses', interpreters', translators', officers', and printers' fees, fees for the service of process, filing fees and the necessary expense of taking depositions and procuring necessary evidence.

The cement plant maintains that the costs at issue do not fall within the statute. We

agree with regard to the first three items in dispute.

■ First, the attorneys' expenses for traveling to take depositions are not taxable as costs. Such expenses are not specifically provided for in SDCL 15–17–4, and in *Hayes Estate, supra,* we quoted with favor *Shterk v. Veitch,* 135 Minn. 349, 160 N.W. 863 (1917), which specifically ruled that attorneys' travel expenses are not taxable as costs. We also note that the deposition expense which this court approved of in *Grady, supra,* did not involve any attorney travel expenses. *See also* 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2666, 2676 (1983) (the federal rule: attorneys' expenses for traveling to take depositions are normally not taxable as costs).

Second, as to fees for both lay witnesses and expert witnesses, SDCL 15–17–4 specifically provides that such fees may be taxed as costs. However, SDCL 19–5–1 also creates a specific amount which witnesses are to be paid: $10.00 per day, plus mileage. There is no statutory authority for an award of witness fee costs beyond the amount mandated in SDCL 19–5–1. Therefore, the trial court abused its discretion by awarding fees for both lay witnesses and expert witnesses which exceeded the statutory maximum. *See also* Wright, Miller & Kane, *supra* at § 2678, which states the federal rule in accord with our holding.

■ On the other hand, we affirm the trial court's award of costs for copies of trial transcripts, deposition fees, and printing fees. All three of these costs are specifically provided for in SDCL 15–17–4, and Arcon supported its claims by affidavits, as required by SDCL 15–6–54(d). In addition, we held in *Brenden v. Anderson,* 327 N.W.2d 136 (S.D.1982), that when depositions are taken in a manner which is not frivolous, and the depositions are necessary for counsel's preparation for trial, the expense is includable as costs even if the depositions are not actually used at trial. Therefore, we find no error in the award of these costs.

## VI

■ On notice of review, Arcon raises the issue of its right to recover prejudgment interest on the damages awarded by the jury. Following the entry of judgment on the jury verdict, Arcon moved for prejudgment interest in the total amount of $590,134.83. This motion was denied by the trial court. Arcon asserts that since this is a contract case in which damages are ascertainable, it is entitled to prejudgment interest. We disagree.

Prejudgment interest is provided for by SDCL 21–1–11:

> Every person who is entitled to recover damages *certain, or capable of being made certain by calculation,* and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt. (emphasis added)

Although prejudgment interest is awardable in highway construction contract claims, *Northern Imp. Co. v. S.D. State Highway Com'n,* 314 N.W.2d 857 (S.D. 1982); *Brezina Const. Co. v. South Dakota Dept., Etc.,* 297 N.W.2d 168 (S.D.1980), the exact sum of the damages must be known or readily ascertainable before such interest may be awarded. *State v. Ed Cox and Son,* 81 S.D. 165, 132 N.W.2d 282 (1965); *Beka v. Lithium Corporation of America,* 77 S.D. 370, 92 N.W.2d 156 (1958). Moreover, a party is not entitled to prejudgment interest if the amount of damages remains uncertain until determined by the trial court. *Fullerton Lumber Co. v. Reindl,* 331 N.W.2d 293 (S.D.1983); *Ed Cox and Son, supra.*

■ Here it is clear that Arcon's damages are neither certain nor readily ascertainable. As Arcon admitted at trial and in its brief, its own records were not usable for purposes of determining actual damages; consequently, Arcon had to rely upon averages, estimates, and blue book

guidelines to try to show damages, all of which were vigorously objected to by the cement plant. Also, as we noted above, the cost estimates from the blue book were far greater than Arcon's own estimated costs in its bids on the projects. In sum, the amount of Arcon's damages was totally uncertain until the jury returned its verdict, and, in fact, is still uncertain in light of our holding in section IV above. Therefore, the trial court correctly found that Arcon does not fall within the requirements of SDCL 21–1–11 and is not entitled to prejudgment interest.

We affirm on the issues of liability and prejudgment interest. We reverse the awards of costs and damages. The case is remanded for recalculation of costs and for retrial on the damage question in accord with the guidelines set forth in this opinion.

WOLLMAN, MORGAN and HENDER-SON, JJ., concur.

FOSHEIM, C.J., dissents.

FOSHEIM, Chief Justice (dissenting).

The majority decision starts out on a wrong premise that the UCC is the appropriate authority to find waiver of cement plant sovereign immunity.

A meaningful waiver assumes there is something to waive. That which is already constitutionally provided leaves nothing to waive by statute. While the UCC would ordinarily waive sovereign immunity for cement plant contracts, that purported waiver had been redundant for two generations. The absence of sovereign immunity

which allowed this type of action was constitutionally imbedded in 1918 when the people adopted Article XIII, Sections 10 and 11.* In that amendment the state was authorized to engage in cement enterprises. As the majority notes, the Section 11 authorization to pledge the credit of the state directly subjects the state to liability on cement enterprise contracts; any other constitutional provision to the contrary notwithstanding. *Wilmington Medical Center, Inc. v. Bradford,* 382 A.2d 1338 (Del. 1978); *Wisconsin Solid Waste Recycling Authority v. Earl,* 70 Wis.2d 464, 235 N.W.2d 648 (1975); *State ex rel. Warren v. Nusbaum,* 59 Wis.2d 391, 208 N.W.2d 780 (1973); Cf. *Opinion of the Judges,* 43 S.D. 635, 177 N.W. 812 (1920).

Since 1947, SDCL 21–32–2 has governed actions on claims against the state. It reads: "Action on any claim on contract ... against the state shall be commenced within one year after same has arisen." As the majority states, the cement plant is an arm of the state. Suits against it are suits against the state. They are thus subject to the one-year statute of limitations for actions on any contract claim against the state. This cause of action accrued with the 1978 breach, SDCL 57A–2–725(2), but was not commenced until April 1980. Arcon's suit is accordingly barred by SDCL 21–32–2.

The majority opinion, however, concludes the UCC statute of limitations extends the time for filing suit to four years. When the dispute arose, SDCL 57A–2–725(1) read in pertinent part: "An action for breach of any contract for sale must be commenced

---

* Article XIII, section 10 provides:

 The manufacture, distribution and sale of cement and cement products are hereby declared to be works of public necessity and importance in which the state may engage, and suitable laws may be enacted by the Legislature to empower the state to acquire, by purchase or appropriation, all lands, easements, rights of way, tracks, structures, equipment, cars, motive power, implements, facilities, instrumentalities and material, incident or necessary to carry the provisions of this

section into effect: provided, however, that no expenditure of money for the purposes enumerated in this section shall be made, except upon a vote of two-thirds of the members elect of each branch of the Legislature. Section 11 provides:

 The state may pledge such cement plants and all the accessories thereto, and may pledge the credit of the state, to provide funds for the purposes enumerated in § 10 of this article, any provision in this Constitution to the contrary notwithstanding.

within four years after the cause of action has accrued."

Since the two statutes of limitation are in apparent conflict it is our duty not to ignore one for the sake of the other, but to give a reasonable construction to both, construing them together to make them harmonious and workable. If possible, both acts are to be reconciled. *Karlen et al. v. Janklow*, 339 N.W.2d 322 (S.D.1983); *Matter of Sales Tax Refund Applications*, 298 N.W.2d 799 (S.D.1980); *State v. Myott*, 246 N.W.2d 786 (S.D.1976).

The UCC provision is general. It speaks of any contract for sale. SDCL 21–32–2 is specific. It relates only to any claim on contract against the state. The two statutes are readily harmonized by reading the four-year UCC provision to apply to an action on any contract involving sale of goods except when commenced against the state. When the action is against the state, the specific one-year statute of limitations applies.

Provisions contained in any chapter of the code may be construed and considered in the light of their codified arrangement. SDCL 2–14–11. However, construction of the scope of the statute is not confined to its particular codified place. The general rule is that the court may write no limitations on the construction of a statute. The majority opinion ignores the universally recognized rule of statutory interpretation that general words are to have a general operation where the manifest intention of the legislature affords no ground for qualifying or restricting them. 73 Am.Jur.2d Statutes § 199 (1974). In determining the scope of a statute, courts must look first to its language. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). By its very words, SDCL 21–32–2 does not confine itself to chapter 21–32. It reads as an island. Being so worded, it should be read as though it were independent of the chapter in which it is found unless the legislature otherwise indicates. To hold otherwise would allow a codifier of statutes to distort the meaning of a statute simply by discretionary indexing.

These guidelines of construction compel the conclusion that the one-year statute of limitations is as applicable now as it was before the UCC was adopted. In enacting the UCC the legislature structured certain suits against the state, but consistent with precedent we must not expand the exposure of the sovereign beyond the preexisting and more restrictive statute of limitations applicable only to the state in favor of a more liberal limitation applicable to all others.

We must be mindful of the case law which holds that statutes in derogation of sovereignty are strictly construed in favor of the state, so that its sovereignty is upheld and not narrowed or destroyed. *Duguay v. Hopkins*, 191 Conn. 222, 464 A.2d 45 (1983); *Andrade v. State*, 448 A.2d 1293 (R.I.1982); *Greenfield Const. Co. v. Michigan Dept. of State Highways*, 402 Mich. 172, 261 N.W.2d 718 (1978). The extent of liability should be definitely fixed by legislative action. *Arms v. Minnehaha County*, 69 S.D. 164, 7 N.W.2d 722 (1943). We violate that time-honored concept when we fail to strictly construe statutes in derogation of sovereignty. As between the two conflicting statutes, we should accordingly give deference to that statute which least exposes the sovereign.

This construction reads in harmony with the UCC Title. SDCL 57A–1–104 provides:

This title being a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by *subsequent* legislation if such construction can reasonably be avoided. [emphasis added]

This statute is silent as to prior legislation and we must assume the legislature had full knowledge of SDCL 21–32–2 when the UCC was adopted. The failure of SDCL 57A–1–104 to save itself also from prior conflicting statutes supports the continued viability of SDCL 21–32–2 as a statute of limitations for all actions against the state.

If practicable, a uniform act should be given such a construction as will harmonize it with the general principles of law in force before its enactment. 73 Am.Jur.2d Statutes § 340 (1974). The language of SDCL 57A–2–725 places an upper limit of four years for sales actions, but it does not foreclose another statute from modifying its provisions. In fact, the UCC expressly anticipates such an occurrence. SDCL 57A–1–103 provides: "Unless displaced by the particular provisions of this title, the principles of law and equity ... or other validating or invalidating cause shall supplement its provisions." Principles of law include both case law and statutes such as SDCL 21–32–2. This interpretation draws support from the fact the legislature rejected and declined to adopt § 10–103 of the UCC into South Dakota law. That section would have repealed all acts and parts of acts inconsistent with the Uniform Commercial Code as adopted. There is no indication that the UCC intended to displace contrary statutes of limitation which can be harmonized with the UCC, as can SDCL 21–32–2. SDCL 21–32–2 accordingly supplements by further restricting the limitation of actions provisions in the UCC whenever the state is a defendant.

Just as the UCC added nothing to waiver of sovereign immunity on cement contracts, neither did it add anything to the limitation of actions against the State. It was redundant as to both.

I would dismiss the action entirely for want of timely commencement.