**SOUTH DAKOTA STATE CEMENT PLANT COMMISSION, d/b/a South Dakota Cement Plant, for the Use and Benefit of the STATE OF SOUTH DAKOTA, Plaintiff,**

v.

**WAUSAU UNDERWRITERS INSURANCE COMPANY, a Member of Wausau Insurance Companies, Defendant.**

Civ. No. 91–3027.

United States District Court, D. South Dakota.

Nov. 27, 1991.

Ronald W. Banks, Banks, Johnson, Johnson, Colbath & Huffman, P.C., Rapid City, S.D., for plaintiff.

James C. Robbennolt, Olinger, Lovald, Robbennolt & McCahren, P.C., Pierre, S.D., and Patricia St. Peter, Brooks F. Poley, Zelle & Larson, Minneapolis, Minn., for defendant.

## AMENDED MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

On June 20, 1991, plaintiff sued Employers Insurance of Wausau,[1] in the Sixth Judicial Circuit Court of South Dakota. Plaintiff seeks judicial determination of the extent of the liability coverage provided by defendant and recovery for breach of defendant's alleged contractual duty to defend plaintiff in an action brought against the Cement Plant in Wyoming.

Under 28 U.S.C. § 1441, defendant removed the case to this Court, alleging that this Court has jurisdiction under 28 U.S.C. § 1332 on the ground that diversity of citizenship exists between plaintiff and defendant and that the amount in controversy exceeds $50,000.00.

Plaintiff has moved to remand the case to the State court, contending the Cement Plant is not a citizen of the State of South Dakota for diversity purposes and this Court thus lacks jurisdiction under 28 U.S.C. § 1332.

## DISCUSSION

■ The issue before this Court is one of subject matter jurisdiction. A U.S. district court may accept a case upon removal from a State court only if the case is one that originally could have been brought in federal court. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987) (citing 28 U.S.C. § 1441(a)). The governing removal statute reads in part:

> Except as otherwise expressly provided by Act of congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a). In this case, the defendant removed the suit to this Court under 28 U.S.C. § 1332, which grants federal district courts original jurisdiction over:

> (a) ... all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—
>
> (1) citizens of different States; ...

28 U.S.C. § 1332(a)(1).

Neither side disputes the amount in controversy requirement. The diversity of citizenship requirement is, however, at the heart of the parties' disagreement. Plaintiff contends that, as an arm of the executive branch of the South Dakota State government, it brought suit against defendant in the name of the State of South Dakota. Defendant maintains that the Cement Plant is in fact a commercial entity independent of the State of South Dakota and thus a "citizen" for diversity purposes.

■ A State is not a "citizen" for the purposes of diversity jurisdiction. *Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973). And if an agency, commission, or political subdivision that is party to a suit is an arm of the State, that entity similarly does not qualify as a "citizen" who can sue and be sued in federal court under 28 U.S.C. § 1332. *Id.* at 693, 93 S.Ct. at 1785. Thus, if the Cement Plant is an alter ego of the

---

1. In the initial complaint, defendant was erroneously named as Wausau Underwriters Insurance Company.

State of South Dakota, this Court lacks diversity jurisdiction.

This Court considered a somewhat similar question in *Board of Regents v. Hoops*, 624 F.Supp. 1179 (D.S.D.1986). In *Hoops*, the status of the State Board of Regents, which governs the state-supported educational institutions, was examined upon removal of the case from state court. The several factors considered in determining whether this agency was a "citizen" included the agency's right to hold and use property; its authority to sue and be sued in its corporate name; the extent of its independent management authority; the treatment of the agency by the State's courts; whether the State was responsible for the agency's debt; the agency's concern with statewide, as opposed to local problems; and the degree of financial autonomy of the agency. *Id.* at 1181 (citing *Tradigrain Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131, 1132 (5th Cir. 1983)). No one factor standing alone is conclusive as to the citizenship status of a state agency or commission. Rather, the relative weight of each of these listed factors is considered by examining the state constitution, applicable statutes, and pertinent case law. *See Tradigrain*, 701 F.2d at 1132.[2] *See also Peter Kiewit Sons Co. v. South Dakota State Highway Comm'n*, 269 F.Supp. 333, 337 (D.S.D.1967) (in deciding that South Dakota Highway Commission is "arm of the state," district court stated "[a]lthough the federal court makes an independent determination of the character and status of a state agency, it is influenced by state decisions").

The Cement Plant's management powers granted by the statute suggest that it enjoys a certain degree of autonomy. The South Dakota Cement Plant Commission controls the management of the Plant, SDCL 5–17–2.3, and its members are compensated from the cement plant fund. SDCL 5–17–4. The Commission also has the power to hire employees and other professionals, including attorneys. SDCL 5–17–5. The Cement Plant Commission can acquire property, SDCL 5–17–8, can sell or lease real and personal property, SDCL 5–17–18, and can borrow money and issue bonds, SDCL 5–17–19. The legislature has also given the Commission the specific authorization to operate the Rapid City Plant, including the power to sell the cement products, to establish the prices, to repair, maintain, and improve the facilities, and to purchase equipment. SDCL 5–7–10. Indeed, the statutory provisions appear to grant the Commission, comprised of persons expert in a variety of skills,[3] a significant degree of autonomy to make management decisions regarding the efficient operation of the State Cement Plant. To a great extent, the State Cement Plant enjoys significant "independent management authority."

The applicable statutory provisions, while granting the Commission freedom to manage and operate the Plant, also provide

**2.** In *Tradigrain,* the Fifth Circuit stated that "[i]n determining whether the agency is an alter ego of the state or an independent agency, the essential question is whether the state is the real party in interest in the lawsuit. The resolution of this question is a matter of state law." *Tradigrain,* 701 F.2d at 1132 (citations omitted). The Fifth Circuit recognized "[i]n a typical situation, some factors will suggest that the agency is 'citizen' while others will just as strongly suggest that the agency is merely an alter ego of the state. The court must balance these against each other in reaching its conclusion. It must never, however, lose sight of the primary question involved: whether the state is the real party in interest in the lawsuit nominally brought against the agency." *Id.* at 1133. In the case before this Court, the Cement Plant, whose independent status is at issue, brought suit as plaintiff against defendant Wausau; yet the analysis remains the same. *See State of Missouri ex rel Webster v. Best Buy Co.,* 715 F.Supp. 1455 (E.D.Mo.1989) (where State is the true party in interest, the State is not a citizen for diversity purposes and cannot bring suit in federal court); *State of Connecticut v. Levi Strauss & Co.,* 471 F.Supp. 363 (D.Conn.1979) (to the extent that Connecticut initiates lawsuit in its sovereign capacity, it is not a citizen for the purposes of federal diversity jurisdiction).

**3.** Of the seven member board, one member is to be an expert in business management, one in personnel management, one in private or public finance, and one in marketing management. Another member shall be a commercial user of the products produced by the cement plant; and the final two shall be chosen from the public at large. SDCL 5–17–2.2.

substantial links to the State government.[4] For example, the Cement Plant's proprietary powers are qualified by significant State involvement. Specifically, the Plant has the power of eminent domain. SDCL 5–17–8. When the Commission deems it necessary, the Attorney General institutes the condemnation proceedings in the name of the State. *Id.* The Cement Plant Commission has the general authority to purchase real property; but when it sells, leases, or exchanges surplus real property, those transactions must be made in the name of the State of South Dakota and approved by the Governor. SDCL 5–17–8; SDCL 5–17–17. And if the Commission acquires property outside the State, title is to be held in the name of the State of South Dakota. SDCL 5–17–8.

In determining the Cement Plant's status in relation to the State, the extent of the Plant's financial autonomy is an influential factor. *See Tradigrain Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131 (5th Cir. 1983); *Board of Regents v. Hoops*, 624 F.Supp. 1179 (D.S.D.1986). The Plant can borrow money and issue bonds. These bonds, however, "shall be executed in the name and on behalf of the state," must be imprinted with the words "Internal Improvement Bonds of South Dakota," and will have affixed to them the State seal. SDCL 5–17–19. Furthermore, the state constitution authorizes the State to pledge the Cement Plant its credit to provide for the operation of the Plant and the manufacture of cement products. S.D.Const. art. XIII, § 11. The State not only pledges its "good faith and credit" to the redemption of the bonds, but also authorizes a tax to be levied to pay the bonded indebtedness.

SDCL 5–17–23. The Commission is further authorized to issue "negotiable coupon general obligation bonds of the state" for the specific purpose of enlarging the Rapid City plant. SDCL 5–17–23. These bonds are, in the first instance, to be secured by the revenues of the Cement Plant. SDCL 5–17–24. But the State again pledges its full faith and credit to make up the difference whenever those revenues are insufficient to meet the immediate payments of principal and interest. *Id.* Financially, the Cement Plant enjoys significant State support.

Examination of the general characteristics of the Cement Plant also suggests that the Plant is ultimately closely linked to the State of South Dakota in its governmental capacity. Both the South Dakota Constitution and corresponding statutory provisions declare that the operation of the Cement Plant is considered a governmental function as well as a public necessity. The South Dakota Constitution states that "[t]he manufacture, distribution and sale of cement and cement products are hereby declared to be works of public necessity and importance in which the state may engage...." S.D.Const. art. XIII, § 10. Furthermore, this section grants the legislature the authority to empower the *state* "to acquire, by purchase or appropriation, all lands, easements, rights of way, tracks, structures, equipment, cars, motive power, implements, facilities, instrumentalities and material, incident or necessary to carry the provisions of this section into effect...." *Id.* In accordance with this grant of authority, the legislature also determined that "the manufacture, distribution, and sale of cement and cement products are public pur-

---

**4.** In determining whether a California county was a citizen for federal diversity jurisdiction, the United States Supreme Court closely examined the applicable State statutory provisions. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). The Supreme Court emphasized the fact that the county was given "corporate power" and was designated a "body corporate and politic." *Id.* at 719, 93 S.Ct. at 1801. The county was further deemed a "'local public entity' in contrast to the State and state agencies." *Id.* It was liable for all judgments against it, had its own independent powers of taxation, and was authorized to provide

public services for its residents. *Id.* These counties, like the Cement Plant, could also issue bonds. But, unlike the South Dakota Cement Plant, the California counties did not have the financial backing of the State. In addition, the California Supreme Court had stated that "counties have [ ] been declared public corporations or quasi-corporations...." *Id.* at 720, 93 S.Ct. at 1801. The South Dakota Cement Plant is, in contrast, not a corporation. Instead, the legislature created the Commission to operate and manage a Plant for the production of cement and cement products. *See* SDCL 5–17–1, *et seq.*

poses impressed with a public use and as such governmental functions subject to regulation by the state." SDCL 5–17–1.

These constitutional and statutory declarations indicate that South Dakota and its people consider the production of cement to be a governmental function that alleviates a "state wide," and not simply a "local," problem. *See Tradigrain Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131 (5th Cir.1983); *Board of Regents v. Hoops*, 624 F.Supp. 1179 (D.S.D.1986). *See also Reeves, Inc. v. Stake*, 447 U.S. 429, 430, 100 S.Ct. 2271, 2274, 65 L.Ed.2d 244 (1980) (project to build state cement plant was "initiated in response to recent regional cement shortages that 'interfered with and delayed both public and private enterprises,' and that were 'threatening the people of this state' ") (quoting *Eakin v. South Dakota State Cement Comm'n*, 44 S.D. 268, 183 N.W. 651, 652 (1921)).[5]

The history of the South Dakota Cement Plant's creation also suggests an association between the Cement Plant and the State of South Dakota in its governmental capacity. The Plant was established during the Progressive era, when the public was in favor of state ownership of business to avoid the high prices of, and the concentration of wealth in, monopolies. *Reeves*, 447 U.S. at 430 n. 1, 100 S.Ct. 2274 n. 1. Private industry, at least in the area of cement production, was seen as largely incapable of serving the "public needs." *Id.* Not only had the sole cement plant in the State recently closed, there was also a "fervent desire to make the services of the state government available to agriculture." *Id.* Furthermore, the South Dakota Supreme Court, shortly after the establishment of the Plant, found specifically:

> [T]he manufacture of cement, under the conditions existing in the state of South Dakota, is the carrying out of a public

purpose ... [and] the manufacture, distribution, and sale of cement and cement products by the state will tend to promote the public welfare, prosperity, and contentment of all the citizens of the state, and will tend to secure equality of economic opportunity.

*Eakin*, 183 N.W. at 651–52. In this atmosphere, the State Cement Plant and a corresponding Commission were established.

The statutory provisions governing the Cement Plant do not explicitly address the Plant's "power to sue and be sued," another helpful factor in determining the status of a state agency or commission for federal jurisdiction purposes. *See Tradigrain Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131 (5th Cir.1983); *Board of Regents v. Hoops*, 624 F.Supp. 1179 (D.S.D.1986). The South Dakota Supreme Court has, however, decided the Plant's amenability to suit in the limited contexts of breach of contract under the Uniform Commercial Code, *Arcon Constr. Co. v. South Dakota Cement Plant*, 349 N.W.2d 407 (S.D.1984), and commercial torts, *L.R. Foy Constr. Co., Inc. v. South Dakota State Cement Plant Commission*, 399 N.W.2d 340 (S.D.1987). These cases held that, under the circumstances presented, the Cement Plant could be sued. These cases do not, however, support the general finding that the Cement Plant is an independent entity distinct from the State of South Dakota. The majority in *Arcon* began its analysis with a description of the Cement Plant as "clearly an arm of the state," *Arcon*, 349 N.W.2d at 410, and then proceeded to determine whether the immunity that accompanied the sovereign status of the State had effectively been waived. The conclusion was that "when the legislature enacted the U.C.C. it expressly waived sovereign immunity for the cement plant whenever

---

5. The South Dakota Supreme Court in *Eakin v. South Dakota State Cement Comm'n*, 44 S.D. 268, 183 N.W. 651, 652 (1921), found "[t]hat cement and its products are commodities that are necessary to the people of this state; [and] that they cannot be procured through individual effort." Similarly, the Cement Plant does not, at least in recent years, appear to have limited its commercial activity to any specific area of

the State. *See Arcon Constr. Co. v. South Dakota Cement Plant*, 349 N.W.2d 407 (S.D.1984) (suit involving contracts for a project on Interstate 29 north of Watertown, South Dakota, and a project on Highway 281 near Aberdeen, South Dakota); *L.R. Foy Constr. Co., Inc. v. South Dakota State Cement Plant Comm'n*, 399 N.W.2d 340 (S.D.1987) (suit involved contract to build new high school in Spearfish, South Dakota).

the cement plant enters into contracts for the sale of goods." *Id.* Thus, the Cement Plant would apparently have been entitled to sovereign immunity had the legislature not expressly waived it for those instances in which it enters contracts that are governed by the U.C.C.

Defendant Wausau focuses on language in *L.R. Foy,* the other South Dakota Supreme Court case that addresses the Plant's amenability to suit, to support its position in favor of removal. In *L.R. Foy,* a majority of the court [6] stated:

> The Cement Plant was created solely for the purpose of engaging in a commercial function and is wholly unrelated to any governmental function of the State. Where the State elects to operate a business enterprise solely for commercial purposes, it ought not be permitted to avoid its legal responsibility by invoking the doctrine of governmental immunity. The Cement Plant should be amenable to suit for mismanagement, bad faith actions and negligent conduct, just as the private sector is made responsible.

*L.R. Foy,* 399 N.W.2d at 346. This statement, read in isolation, contradicts the South Dakota Constitution and corresponding statute that declare the sale and manufacture of cement a public and governmental function, the earlier *Arcon* case, and the remainder of the *L.R. Foy* opinion itself, which extends the Cement Plant's waiver of sovereign immunity to include commercial torts.

Although inconsistent on its face, the language in *L.R. Foy* need not be interpreted as contradictory to any of these authorities. When read in light of the *L.R. Foy* dissent, the description of the Plant given by the *L.R. Foy* majority may be read as serving a different purpose. The dissent, written by Justice Fosheim, distinguishes the waiver of immunity for breach of contract claims, as found by the majority in *Arcon,*[7] from a waiver of immunity for commercial torts, which the majority found in *L.R. Foy.* Specifically, the *L.R. Foy* dissent explains:

> [T]here is a fundamental difference between Cement Plant's contractual and tort liability which makes it logical to interpret Art. XIII, § 11 as waiving immunity for the former but not for the latter. As the *Arcon* majority stated:
>
>> How can the state pledge its credit for cement plant operations if its credit obligations are not legally enforceable, or what business would contract with the cement plant if the cement plant is shielded from satisfying its contractual obligations? There can be no pledge of state credit without an obligation which is legally enforceable against the state.
>
> 349 N.W.2d at 411 (citations omitted). This basis which dictates the Cement Plant be amenable to its contracts does not exist regarding the plant's tort liability.

*L.R. Foy,* 399 N.W.2d at 352 (Fosheim, J., dissenting).

The language in the *L.R. Foy* majority reads, in this context, as a rationale for the extension of the waiver of immunity to include commercial torts, not necessarily as a description of the Cement Plant's degree of independence from the State for the purposes of diversity jurisdiction. An opinion must be read as a whole, not as solitary

---

**6.** Three of the five justices joined in the part of the opinion that addressed the Cement Plant's sovereign immunity from commercial torts claims.

**7.** Justice Fosheim, who wrote the dissenting opinion in *L.R. Foy,* also dissented from the majority opinion in *Arcon.* The basis for his dissent in *Arcon* was his view that any waiver of sovereign immunity found in the enactment of the U.C.C. was superfluous. The South Dakota constitution, Article XIII, § 11, had already waived this immunity. Because he found the waiver of immunity for commercial contracts originated in the state constitution, not in the U.C.C., Justice Fosheim asserted that the appropriate statute of limitations was the one year limitation generally applicable to contract and tort claims against the State. *See* SDCL 21–32–2. Fosheim believed that sovereign immunity had been waived in this context, making the Cement Plant amenable to suit. Yet unlike the majority who, finding the waiver in the U.C.C., applied the U.C.C.'s four year statute of limitations and thus treated the action as timely, Justice Fosheim believed that the applicable statute of limitations had run.

phrases or paragraphs. The *L.R. Foy* case should be interpreted in light of the fact that none of the state supreme court justices, in either *Arcon* or *L.R. Foy*, expressed the view that sovereign immunity was entirely inapplicable to the Cement Plant.[8] They simply disagreed on the extent and origins of the waiver of that immunity in the specific contexts discussed. To rely upon the disputed language, as does defendant Wausau, to support the assertion that the Cement Plant is a citizen for the purposes of diversity jurisdiction is to apply dicta to the wrong proposition.

This Court is aware of the United States Supreme Court's decision that the Commerce Clause does not bar the State of South Dakota from favoring its own citizens when it sells cement and cement products. *Reeves Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). South Dakota was categorized as a "market participant" in its actions regarding the Cement Plant. Yet the goals that the creation of the Cement Plant was designed to meet are described as governmental. Specifically, the majority states:

> In establishing the plant, South Dakota sought the most unstartling governmental goal: improvement of the quality of life in that State by generating a supply of a previously scarce product needed for local construction and governmental improvements. A cement program, to be sure, may be a somewhat unusual or unorthodox way in which to utilize state funds to improve the quality of residents' lives. But '[a] State's project is as much a legitimate governmental activity whether it is traditional, or akin to private enterprise, or conducted for profit.... A State may deem it as essential to its economy that it own and operate a railroad, a mill, or an irrigation system as it does to own and operate bridges, street lights, or a sewage disposal plant. What might have been viewed in an earlier day as an improvident or even dangerous extension of state activities may today be deemed indispensable.'

*Id.* at 442 n. 16, 100 S.Ct. 2280 n. 16 (citation omitted). And as Judge Lay, in *Reeves, Inc. v. Kelley*, 586 F.2d 1230 (8th Cir.1978),[9] had earlier asserted:

> While a state is similar to private business when it participates in the market in a purely proprietary capacity, it is also somewhat different. As a government providing a public service and utilizing the money and resources of its residents, it has a right and perhaps even an obligation to consider their common good and conserve their resources so long as it does not do so by attempting to regulate or control commerce among the states.

*Id.* at 1233 (citing *Toomer v. Witsell*, 334 U.S. 385, 409, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (Frankfurter, J., concurring)).[10]

---

**8.** Specifically, four of the justices concurred in the majority opinion in the *Arcon* decision, with Justice Fosheim the sole dissenter. *See supra* note 6. The *L.R. Foy* decision consisted of three written opinions. Two justices concurred in the main opinion, finding "that Cement Plant may be held liable for its commercial torts and thus, has waived sovereign immunity." *L.R. Foy*, 399 N.W.2d at 349. One justice concurred separately, stating "I concur, totally, in the sovereign immunity aspect of this writing of the majority opinion." *Id.* at 351 (Henderson, J. concurring in part; concurring in result in part; and specially concurring in part). The dissent, written by Justice Fosheim and joined by Justice Wuest, disagreed with the majority decision to extend the waiver of sovereign immunity found in *Arcon* to include a waiver of immunity for commercial torts. *Id.* at 351–52.

**9.** *Reeves* originated in the Western division of the District of South Dakota and was appealed to the 8th Circuit as *Reeves, Inc. v. Kelley*, 586 F.2d 1230 (8th Cir.1978). The 8th Circuit decision, written by Judge Lay, was appealed to the United States Supreme Court who remanded the decision to allow the 8th Circuit to reconsider its decision in light of the recent opinion in *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (holding that Oklahoma law prohibiting the shipment of Oklahoma minnows out of the State violates the Commerce Clause). On remand, the 8th Circuit reaffirmed its position, deciding that the facts in *Hughes* were sufficiently different from those in *Reeves* to justify finding a violation in the former case but not in the latter. *Reeves, Inc. v. Kelley*, 603 F.2d 736 (8th Cir.1979). The United States Supreme Court decision affirmed this 8th Circuit opinion. *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980).

**10.** The South Dakota Cement Plant appears to have been largely self-supporting over the years. *Reeves*, 447 U.S. at 452, n. 3, 100 S.Ct. at 2285, n.

Never at issue in *Reeves* at the Supreme Court level was whether the actions of the Cement Plant were to be attributed to the State. Once that attribution was made, the question was whether the Commerce Clause applied to those actions. The United States Supreme Court held that it did not. *Reeves*, 447 U.S. 429, 100 S.Ct. 2271.

Similarly, this Court is faced with the initial question of attribution: Are the Cement Plant's activities of such a nature that any suit in which the Plant is involved regarding those activities is in effect a suit involving the State? This Court holds that, for the limited purposes of determining this Court's jurisdiction under 28 U.S.C. § 1332, they are. The State Cement Plant is an arm of the State and not a "citizen" for the purposes of diversity jurisdiction.

■ Plaintiff also alleges that the Eleventh Amendment of the United States Constitution bars federal jurisdiction in this case. The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. In this case, the State is the plaintiff, not the defendant: the South Dakota Cement Plant filed suit against defendant Wausau, a Wisconsin corporation. The contention that the Eleventh Amendment nevertheless has bearing upon this Court's jurisdiction is not supported by any authority cited by either party. Accordingly, this Court will address the Eleventh Amendment claim no further.

This Court's holding is narrow: it resolves the instant issue of federal diversity jurisdiction. This decision does not address the related issues of sovereign immunity and any waivers thereof, as discussed in *Arcon* and *L.R. Foy* and as relied upon by the litigants. A majority of the South Dakota Supreme Court has found reasonable justifications for waiving the Cement Plant's sovereign immunity. The rationale for waiving immunity, however, does not necessarily apply to an analysis to determine federal diversity jurisdiction.

Because this Court lacks jurisdiction under 28 U.S.C. § 1332, the case is hereby remanded to the Sixth Judicial Circuit Court of the State of South Dakota.

---

3 (dissenting opinion). But the fact remains that the State of South Dakota has, through its constitution and statutes, pledged its credit and a limited taxing power to help finance the Plant's debts. S.D.Const. art. XIII, § 11; SDCL 5–17–20; SDCL 5–17–24.